**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

_____
                                                )
**Dana Miller**                              )
                                                )
                                                )
          **Plaintiff,**                     )          **Civil Action No.: 1:05cv02342 (RMC)**
                                                )
**v.**                                          )
                                                )
**Washington Metropolitan Area**    )
**Transit Authority**                   )
                                                )
_____)


**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN**
**SUPPORT OF MOTION FOR SUMMARY JUDGMENT**


Pursuant to Fed. R. Civ. P. 56 and for the reasons set forth in the attached Memorandum, the

plaintiff hereby moves this Court for the entry of summary judgment.  As set forth more fully in

the accompanying Memorandum of Law, at the close of extensive discovery in this matter there

is no genuine dispute as to any material fact. All of the record evidence confirms that the

defendant Washington Metropolitan Area Transit Authority ("WMATA") did sexually harass the

plaintiff and retaliate against her for filing a claim and she is therefore entitled to summary

judgment on all of her claims.

## TABLE OF CONTENTS

**Table of Authorities**…………………………………………………........ 3

**Statement of Undisputed Facts**……………………………………….. ......... 4

**Statement of Issues Presented**………………………………………….... 6

**Standard of Review**…………………………………….. ................................ 7

**Arguments**

    **I.  Sexual Harassment Claims** .......................................................... 8

        **Quid Pro Quo** ...................................................................... 9

        **Hostile Work Environment** .......................................... 12

    **II.  Vicarious Liability**............................................................ 12

**III.  Retaliation Claim** ................................................................ 13

# TABLE OF AUTHORITIES

## Cases

Aka v. Washington Hosp. Center, 156 F.3d 1284, 1295 (D.C.Cir.1998) ........................................... 6

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ............................................................. 6

Brown v. Brody, 199 F.3d 446, 456-57 (D.C. Cir.1999) ............................................................... 12

Burlington Indus. v. Ellerth, 524 U.S. 742, (1998) ........................................................................ 8

Carrero v. New York City Hous. Auth., 890 F.2d 569, 577 (2d Cir.1989) ................................... 8

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ..................................................................... 6

Cones v. Shalala, 199 F.3d 512, 521 (D.C. Cir.2000) .................................................................. 12

Coward v. ADT Security Systems, Inc., 194 F.3d 155, 158 (D.C.Cir.1999) ............................... 6

Cromer-Kendall v. District of Columbia, 326 F.Supp.2d 50, 60 (D.C. 2004) ............................ 13

Gary v. Long, 59 F.3d 1391, 1395 (D.C. Cir.1995) ....................................................................... 8

Greenberg v. Food & Drug Admin., 803 F.2d 1213, 1216 (D.C. Cir.1986) ................................ 6

Hussain v. Principi, 344 F.Supp.2d 86, 107 (D.C.2004) ............................................................. 11

Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994) ..................................................... 7

Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986) ......................................................... 7

Pacheco v. New Life Bakery, Inc., 187 F.3d 1063 (9th Cir. 1999) .............................................. 9

Paquin v. Federal Nat'l Mortgage Ass'n, 119 F.3d 23, 31 (D.C.Cir.1997) .............................. 12

Stanford v. Potomac Elec. Power Co., Civil Action No. 04-1461(RBW), 2006 WL 1722329, at 5 (D.D.C. June 21, 2006). ........................................................................................................... 11

## Statutes

42 U.S.C. § 2000e-2(a)(1) ............................................................................................................ 7

## Rules

Fed.R.Civ.P. 56(c) ........................................................................................................................ 6

<u>Statement of Undisputed Facts</u>

Plaintiff Dana Miller was employed by WMATA as a special police officer in July 2003. Miller Affidavit at 1.  As a special police officer, one of Dana's duties was to serve as a guard at various stations and facilities across WMATA's service area.  On January 21, 2004 during the 3pm - 11pm evening shift, Dana was assigned to staff a security station at the Shady Grove Yard Post. Miller Affidavit at 1.  While on duty at that booth, she proceeded to make use of a combination TV/Radio.  Miller Affidavit at 1.  Around 8:00 pm that evening, Lieutenant Frank Johnson, her supervisor, reported to the Shady Grove Yard Post to deliver some mouse traps.  Miller Affidavit at 1.  When he arrived, he noticed the TV/radio and instructed Dana that it was against WMATA policy to have the TV/Radio at her workstation.  Miller Affidavit at 1.  He went on to request that she write a report stating that she had violated the policy so that it could be turned in and her misconduct could be properly documented.  Miller Affidavit at 1.  Dana followed the instructions of her supervisor and completed the report.  Miller Affidavit at 1.  When she was done, she indicated to Lieutenant Johnson that she was a probationary employee and requested that he give her an oral warning instead of anything written because she was afraid that she may lose her job if she was given a written reprimand.  Miller Affidavit at 2.  Dana understood it to be common practice that minor violations could be addressed by management with a verbal warning because she knew of other officers that had been verbally warned about workplace violations.  Miller Affidavit at 2.

Lieutenant Johnson then asked Dana what she was going to do after work and asked her to come to his house later that evening for sex in exchange for not turning in the written incident report.  Miller Affidavit at 2.  The Lieutenant also told Dana that, if she came to his home to see him

after work, he would give her the write up and she could tear it up without him turning it in.  Miller Affidavit at 2.

At around 9:00pm, while defendant Johnson was still at the post, Lt. Donna Tisdale, another supervisor called to the booth.  Miller Affidavit at 2.  Dana answered the phone and Lt. Tisdale requested to speak with Lt. Johnson.  Defendant Johnson ordered Officer Miller to lie to Lt. Tisdale and say that Defendant Johnson was not with her.  Miller Affidavit at 2.  Dana complied with the order from Lt. Johnson.  Before leaving the booth, Lt. Johnson asked for and received Dana's phone number.  Miller Affidavit at 2.  Shortly after this exchange, Lt. Johnson left the yard.  Miller Affidavit at 2.

Immediately after Lt. Johnson left the post, Dana called her mother, Deborah Miller, who is also WMATA Special Police Officer, to ask her advice as to how to report the incident.  Miller Affidavit at 2.  Deborah told her daughter to report the incident immediately and she did just that.  Miller Affidavit at 2.  Deborah Miller then called and reported the incident to the Chief Dan Hall.  She got his voice mail but decided not to leave a message.  Miller Affidavit at 2.  She also called her cousin Joseph Acres, a former WMATA Police Officer who told her to get pictures of everything that would transpire that night for later proof.  Miller Affidavit at 2.

Deborah and Dana Miller met later that evening to attempt to catch defendant Johnson in the act of completing his scheme.  Miller Affidavit at 2.  While in route to meet her mother, Dana received a call from Lt. Johnson on her cell phone telling her to meet him at a gas station that was down the street from his home.  Miller Affidavit at 2.  Dana picked up her mother and proceeded to meet defendant Johnson with her mother hiding in the back seat of her car.  Dana then followed Lt. Johnson, who was in his own car, to his home at 2013 Brown Lane.  Miller Affidavit at 2.

Lt. Johnson directed Dana to park her car on the street while she proceeded into defendant Johnson's home. Miller Affidavit at 2. Johnson did not realize that Deborah Miller was in the backseat of Dana's car taking pictures of his car and his home. Miller Affidavit at 2. When Dana entered the house, Lt. Johnson asked to take her coat at which time, without her consent, he unbuttoned Dana's coat and fondled her breast. Miller Affidavit at 2. It was at this point that Deborah Miller then rang the doorbell. When Lt. Johnson opened the door, he told Mrs. Miller to come in. Deborah Miller told Lt. Johnson that he was in violation of WMATA harassment polices and that he couldn't use the write-up to make Dana have sex with him. Dana and Deborah Miller then left the residence. Miller Affidavit at 3.

Both Dana and Deborah Miller then immediately called and reported the incident to Chief Dan Hall's voice mail. Chief Hall received that message the next morning not long after he got to work. That same morning, Dana called the Office of Civil Rights (OCR) at WMATA to report the incident, and she spoke to Devan Walker. She had a meeting with both Walker of OCR and also with Captain Highland of WMATA Internal Affairs Department. She subsequently filed a formal complaint with OCR on January 28, 2004. Dana subsequently filed a criminal complaint with Prince George's County Police in Maryland against defendant Johnson on February 6, 2004.

On April 30, 2004, OCR concluded that there was probable cause to find that Lt. Johnson did sexually harass Dana. However, defendant WMATA terminated the Dana's employment on June 1, 2004. The reasons given for the termination were plaintiff's violation of the work rule prohibiting the use of the television at her post. This reason is a pretext as other similarly situated employees were not treated in the same way.

Dana filed a complaint with the Federal EEOC Office on June 23, 2004 and the EEOC issued a right to sue letter on September 8, 2005.

Statement of Issues Presented

1. Did Lt. Johnson sexually harass the plaintiff Dana Miller when he requested sex in exchange for formally reprimanding her for having a television on post?

2. Is WMATA vicariously liable for the sexually harassment perpetrated by Lt. Johnson?

3. Did WMATA retaliate against Dana Miller for filing a complaint alleging sexual harassment?

Standard of Review

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. Summary judgment is mandated after there has been "adequate time for discovery ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment, nonetheless, is a "drastic remedy, [and therefore] courts should grant it with caution so that no person will be deprived of his or her day in court to prove a disputed material factual issue." *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C.Cir.1986). Summary judgment is accordingly not appropriate, for example, where "the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance ...." *Id.* Furthermore, when reviewing the evidence, "all inferences must be drawn in favor of the nonmoving party[.]" *Coward v. ADT Security*

*Systems, Inc.*, 194 F.3d 155, 158 (D.C.Cir.1999); *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1295 (D.C.Cir.1998).

ARGUMENTS

I.    Lt. Johnson sexually harassed Dana Miller when he requested sex in return for not reprimanding her for having a television on post.

According to the plaintiff, on the night in question, Lt. Johnson wrote the plaintiff up for having a television on post; a violation of post orders.  However, after writing his report, he told the plaintiff that he would not turn it in if she came to his house to sleep with him.  The issue at hand is whether or not Lt. Johnson's conduct meets the applicable standards for either a quid pro quo or hostile work environment claim.  Indeed, it meets both tests and is therefore actionable under Title VII.

"[S]exual harassment in the workplace violates Title VII's broad rule of workplace equality. Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir.).  Discrimination on the basis of sex with respect to "compensation, terms, conditions, or privileges of employment" is prohibited. 42 U.S.C. § 2000e-2(a)(1).  The EEOC Guidelines on "Discrimination Because of Sex" define sexual harassment as occurring when:

(1) submission [unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature] is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably

interfering with an individual's work performance or creating an intimidating, hostile,

or offensive working environment.

29 C.F.R. § 1604.11(a).

While the Guidelines are not controlling authority, they provide substantial assistance in this

area of agency expertise. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986).

Sexual harassment cases can proceed on one of two theories: (1) quid pro quo- e.g.,

favorable treatment in return for sought sexual favors-or (2) hostile work environment. See Carrero

v. New York City Hous. Auth., 890 F.2d 569, 577 (2d Cir.1989).


Quid Pro Quo

In general, quid pro quo relates to sexual harassment through threats of retaliation that are

actually carried out.  Gary v. Long, 59 F.3d 1391, 1395 (D.C.Cir.1995) ("The gravaman of a quid pro

quo claim is that a tangible job benefit or privilege is conditioned on an employee's submission to

sexual blackmail and that adverse consequences flow from the employee's refusal.") Id.  If there is

no tangible employment action, "bothersome attentions or sexual remarks that are sufficiently

severe or pervasive ... create a hostile work environment."  Burlington Indus. v. Ellerth, 524 U.S.

742, (1998).  In either event, "Title VII is violated by either explicit or constructive alterations in the

terms or conditions of employment ... [but] the latter must be severe or pervasive." Id. at 752.

"[I]ncidents of environmental sexual harassment 'must be more than episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive.'"  Faragher, 524 U.S. at 787.

"[A] sexually objectionable environment must be both objectively and subjectively offensive, one

that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive

to be so." Id. at 776.  In evaluating a claim of sexual harassment, the Supreme Court has directed the

lower courts to " 'look[ ] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" _Id. at 787-88_, "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." _Id. at 788_.

In sum, to succeed on a quid pro quo sexual harassment theory, one must prove that (1) he or she encountered verbal, visual or physical propositions or advances of a sexual nature; (2) the harassment was based on her gender, (3) she experienced the propositions or advances as subjectively unwelcome; and (4) the harassment was perpetrated by a supervisor, manager or other high ranking agent of the employer[1]. See Pacheco v. New Life Bakery, Inc., 187 F.3d 1063 (9th Cir. 1999).

In the case at hand, Lt. Johnson propositioned the plaintiff to come to his home to have sex with him in exchange for not turning in the written reprimand for having a television on her post. This undoubtedly satisfies the first prong of the test set forth in _Pacheco_ because this was a verbal proposition that was being made because the plaintiff was female. The plaintiff has always maintained that the propositions were unwelcome as she had no desire to have sex with Lt. Johnson and indeed did not have sex with him before, at the time of or after the propositions were made. Finally, we know that Lt. Johnson was a supervisor in the sense that he provided recommendations for discipline and did indeed order the plaintiff to submit to the discipline process when he wrote her up.

---

[1] To be a supervisor for purposes of imputing liability to an employer, a harasser must possess at least some of the standard indicia of supervisory authority, e.g. the power to hire, fire, demote, promote, transfer, or discipline or effectively recommend those actions. _Id._
It is undisputed that Lt. Johnson had supervisory authority. "He was basically a street supervisor, and he had a lot of supervision directly over the special police officers when it came to discipline, doing their time and attendance and administrative issues." Deposition of Captain Donna Tisdale at 8. See also the deposition of Deputy Chief Lee at 9 ("So, this recommendation of a one-day suspension is for Lt. Johnson for not conducting his supervisory responsibilities.").

In essence, a tangible job benefit (not being reprimanded) was conditioned upon the plaintiff having sex with Lt. Johnson. Both the plaintiff and Lt. Johnson knew that the reprimand would lead to an adverse employment action because the plaintiff made him aware of it by telling him that she could not afford to get into any more trouble at work and that she wanted her job. To complete the analysis of these acts one must also look at the final result of the offered tangible job benefit. The plaintiff never got that benefit because she did not follow through and actually sleep with Lt. Johnson. Lt. Johnson offered the benefit and then actually followed through by turning in the write up to their superior officers. In the end, as the defendant argues, the plaintiff was fired because she had a television on post. In essence, Lt. Johnson made the threat, the plaintiff failed to comply and in the end, she was fired for exactly the thing that Lt. Johnson threatened her with. When an employee proves that tangible employment action resulted from refusal to submit to supervisor's sexual demands, she establishes that employment decision itself constitutes change in terms and conditions of employment that is actionable under Title VII. See Burlington Indus., 524 U.S. at 753-754. Under the law this is clear cut sexual harassment at its worst.

Under the test set forth in Burlington Indus., 524 U.S. at 752, Ms. Miller's quid pro quo claim can survive only if she can demonstrate supervisory threats that were then carried out because she refused to accede to sexual demands. 524 U.S. at 751. There can be no doubt that the facts of the case at hand fall squarely within the four corners of the Burlington test. Lt. Johnson's threats were carried out to their inevitable end on the day that the defendant terminated her for having a television on post.[2]

---

[2] WMATA has maintained that the reason for the plaintiff's termination was because she had a television on post. However, through out the discovery process it has become evident that this reason was used as a pretext for her termination.
See testimony of Deputy Chief Jeri Lee:
Question: […] [H]ave you had to deal with other employees who have had TVs on post?
Answer: During my tenure. I have not had anyone charged or observed with televisions on post. But the department, as far as the Special Police have had an occasion to have TVs on post and they were disciplined.

<u>Hostile Work Environment</u>

"A hostile work environment exists when workplace conditions are so suffused with discriminatory intimidation, ridicule and insult of such severity or pervasiveness as to alter the conditions of the victim's employment and create an abusive working environment. To make out such a claim, it is not enough to merely show harassment, for Title VII does not prohibit all forms of workplace harassment, only those directed at discrimination because of sex, race, religion, or national origin." <u>Hussain v. Principi</u>, 344 F.Supp.2d 86, 107 (D.D.C.2004). In order to survive a motion to dismiss, "[a] plaintiff need only state a causal connection between his [protected status] and his hostile work environment claim." <u>Stanford v. Potomac Elec. Power Co.</u>, Civil Action No. 04-1461(RBW), 2006 WL 1722329, at 5 (D.D.C. June 21, 2006).

In this case, the facts are clear. Lt. Johnson did subject the plaintiff to a hostile work environment based on her protected status as a woman. This fact was even clear in the defendant's own internal review of the matter. In their letter to the plaintiff, the defendant's Office of Civil Rights found that there was probable cause that harassment did occur that evening.

---

Question: Were they terminated?
Answer: No, they were not.

See Defendant's Response to Interrogatory 10:
Other than Plaintiff, one other special police officer was disciplined for having a television on post during the requested time period. Pamela Biggs has had a television on post on three different occasions […] resulting in a one day suspension, […] a five-day suspension, […] and a[nother] five day suspension […].

The defendant also responded to the interrogatories for records of other probationary employees and their discipline over the past four (4) years. In response, the chart submitted shows a total of thirty-two (32) employees who were disciplined a total of sixty (60) times. Of those sixty (60) instances, only eight (8) resulted in termination. Therefore, the reason given for terminating Dana was a pretext. An overwhelming majority, over 96% of employees disciplined while on their probationary period are NOT terminated. The majority of those employees, like Dana, are disciplined multiple times and are allowed to keep their jobs.

II.     The Defendant is vicariously liable for the discriminatory actions of Lt. Johnson.

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.  Burlington Indus., 524 U.S. at 765.  When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c).  The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Id. While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.  Id. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. Burlington Indus., 524 U.S. at 765.

In the case at hand, the analysis need not go any further than the fact that a tangible employment action was taken.  Under *Burlington* there can be no affirmative defense offered.  It is undisputed that Lt. Johnson had supervisory authority over the plaintiff.  Even assuming arguendo that the defendant raised the affirmative defense, it is clear that the second prong is not satisfied.

The plaintiff availed herself of the process in place for reporting sexual harassment. She immediately reported the incident to her Deputy Chief, she filed criminal charges against Lt. Johnson and she also cooperated with the internal affairs investigation until its conclusion when she was fired.

III.     The defendant retaliated against the plaintiff for filing a complaint alleging sexual harassment.

To establish a prima facie claim of retaliation the "plaintiff must establish that she engaged in activity protected by Title VII , that the employer took an adverse employment action against her, and that the adverse action was causally related to the exercise of her rights." Cones v. Shalala, 199 F.3d 512, 521 (D.C.Cir.2000) (citing Paquin v. Federal Nat'l Mortgage Ass'n, 119 F.3d 23, 31 (D.C.Cir.1997)). Adverse actions are defined by the District of Columbia Circuit as "tangible employment action[s] [that] constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Brown v. Brody, 199 F.3d 446, 456-57 (D.C.Cir.1999) (citations omitted). A critical element in establishing a prima facie case of retaliation is a showing by the plaintiff that she suffered an adverse personnel action. [A]n employee suffers an adverse employment action if [s]he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm. Cromer-Kendall v. District of Columbia, 326 F.Supp.2d 50, 60 (D.C. 2004).

The evidence in this case bears no contradiction that the plaintiff did indeed suffer an adverse employment action. She filed a complaint with the OCR almost immediately after the

incident occurred.  The OCR investigated and found that there was probable cause for her

complaint.  She was subsequently fired after OCR published their findings.


## **CONCLUSION**

For the reasons set forth in the petition and in this memorandum, the plaintiff requests that

the court enter summary judgment  in favor of the plaintiff on all counts of the complaint.


Respectfully submitted,


_____
E. Lindsey Maxwell II, Esq.  DC Bar No. 480035
Perennial Law Group, LLP
1455 Pennsylvania Ave., NW
Suite 225
Washington, DC 20004
(202) 638-5090 (p)
(202) 638-5564 (f)

November 17, 2006

**Certificate of Service**

I hereby certify that a copy of the foregoing Return of Service was mailed this 17th day of November 2006, postage prepaid, to the following individual:

Washington Metropolitan Transit Authority
Attn: Michael Guss
600 5th St., NW
Washington, DC 20001

_____
E. Lindsey Maxwell II, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
CIVIL DIVISION

Dana Miller                                    )
                                               )
        Plaintiff,                             )
                                               )
v.                                             )
                                               )        Civil Action No.: 1:05cv02342 (RMC)
Washington Metropolitan Area                   )
Transit Authority                              )
                                               )
                                               )
        Defendants                             )
                                               )

## AFFIDAVIT

1. I, Dana Miller was employed by WMATA as a special police officer in July 2003. As a special police officer, one of my duties was to serve as a guard at various stations and facilities across WMATA's service area.

2. On January 21, 2004 during the 3pm - 11pm evening shift, I was assigned to staff a security station at the Shady Grove Yard Post. While on duty at that booth, I proceeded to make use of a combination TV/Radio.

3. Around 8:00 pm that evening, defendant Frank Johnson, my supervisor, reported to the Shady Grove Yard Post to deliver some mouse traps. When he arrived he noticed the TV/radio and instructed the Plaintiff that it was against WMATA policy to have the TV/Radio at my workstation. He went on to request that I write a report stating that I had violated the policy so that it could be turned in and her misconduct could be properly documented.

4. I followed the instructions of my supervisor and completed the report.

Page 1

5. I indicated to defendant Johnson that I was a probationary employee and requested that he give me an oral warning instead of anything written because I was afraid that I may lose my job if I was given a written reprimand. Defendant Johnson and I were aware that an oral reprimand in this situation was possible.

6. Defendant Johnson then asked me what I was going to do after work and asked me to come to his house later that evening for sex in exchange for not turning in the written incident report. He also told me that, if I came to his home to see him after work, he would give me the write up and I could tear it up.

7. At around 9:00pm, while defendant Johnson was still at the post, Lt. Tisdale, another supervisor called to the booth. I answered the phone and Lt. Tisdale requested to speak with defendant Johnson. Defendant Johnson ordered me to lie to Lt. Tisdale and say that Defendant Johnson was not with her. I complied with the order from Lt. Johnson. Before leaving the booth, Lt. Johnson asked me for my phone number and I gave it to him. Shortly after this exchange, Lt. Johnson left the yard.

8. After defendant Johnson left the post, I called my mother, Deborah Miller, who is also a WMATA Special Police Officer, to ask her advice as to how to report the incident. Deborah Miller told her daughter to report the incident immediately. Deborah Miller then called and reported the incident to the Chief Dan Hall. She got his voice mail but decided not to leave a message. She also called her cousin Joseph Acres, a former WMATA Police Officer who told her to get pictures of everything that would transpire that night for later proof.

9. My mother and I met later that evening to attempt to catch defendant Johnson in the act of completing his scheme. While in route to meet my mother, I received a call from defendant Johnson on my cell phone telling me to meet him at a gas station that was down the street from his

Page 2

home. I proceeded to meet defendant Johnson with my mother hiding in the back seat of my car. I then followed defendant, who was in his own car, to his home at 2013 Brown Lane.

10. I parked my car on the street and proceeded into defendant Johnson's home. Defendant Johnson did not realize that Deborah Miller was in the backseat of the car. Deborah Miller took pictures of his car and his home.

11. When I entered the house, defendant Johnson asked to take my coat at which time, without my consent, he unbuttoned my coat and he fondled my breast. My mother then rang the doorbell and defendant Johnson opened the door. When he opened the door, he told Mrs. Deborah Miller to come in. My mother told Lt. Johnson that he was in violation of WMATA harassment polices and that he couldn't use the write-up to make me have sex with him. My mother and I then left the residence.

12. My mother and I then immediately called and reported the incident to Chief Daniel Hall's voice mail. Chief Hall received that message the next morning not long after he got to work.

13. That same morning, I called the Office of Civil Rights (OCR) at WMATA to report the incident, and I spoke to Devan Walker. She had a meeting with both Walker of OCR and also with Captain Heilmann of WMATA Internal Affairs Department. She subsequently filed a formal complaint with OCR on January 28, 2004.

14. I filed a criminal complaint with Prince George's County Police in Maryland against defendant Johnson on February 6, 2004.

15. On April 30, 2004, OCR did conclude that there was probable cause to find that defendant Johnson did sexually harass me.

16. On June 1, 2004, defendant WMATA terminated my employment. The reasons given for the termination were plaintiff's violation of the work rule prohibiting the use of the television at

Page 3

her post. This reason is a pretext as other similarly situated employees were not treated in the same way.

    17. I filed a complaint with the Federal EEOC Office on June 23, 2004.

    18. The EEOC issued a right to sue letter on September 8, 2005.

Respectfully submitted,

Dana Miller

November 15, 2006

Page 4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| ———————————————————— ) | |
| **Dana Miller** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.: 1:05cv02342 (RMC)** |
| ) | |
| **v.** ) | |
| ) | |
| **Washington Metropolitan Area** ) | |
| **Transit Authority** ) | |
| ) | |
| ————————————————————) | |

**ORDER**

It is hereby ordered by this Court after consideration of the Plaintiff's Motion for Summary Judgment and the Memorandum in Support thereof that the Plaintiff's Motion for Summary Judgment is hereby GRANTED this _____th day of _____, 2006.

_____
**Rosemary M. Collyer**
**Judge**
**U.S. District Court - DC**

Page 17