## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DANA MILLER, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) **C.A. No. 05-2342 (RMC)** |
| **v.** | ) |
| | ) |
| WASHINGTON METROPOLITAN AREA | ) |
| TRANSIT AUTHORITY, et al., | ) |
| | ) |
| **Defendant.** | ) |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Washington Metropolitan Area Transit Authority (WMATA) moves for summary judgment and dismissal of the Complaint, with prejudice, with respect to Plaintiff's allegations against WMATA, pursuant to FED. R. CIV. P. 56. WMATA is entitled to summary judgment because (1) the Plaintiff cannot establish a prima facie case of sexual harassment in violation of Title VII under a *quid pro quo* or hostile work environment theory, (2) the Plaintiff cannot show that WMATA's legitimate, non-discriminatory and non-retaliatory reason for terminating her employment was merely pretext, considering that the Plaintiff admitted to the very conduct that resulted in her termination and (3) the Plaintiff cannot establish a causal connection between her protected activity and her termination in support of her retaliation claim. In Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001), the Supreme Court made clear that an employer is free to carry out a ongoing appropriate adverse employment action contemplated, but not yet definitively determined, although the final action does not take place until after the Plaintiff has engaged in protected activity.

The basis for this motion are more fully set forth in the accompanying points and authorities.

Respectfully submitted,

WASHINGTON METROPOLITIAN AREA
TRANSIT AUTHORITY


Carol B. O'Keeffe
General Counsel


_____/s/_____
Mark F. Sullivan
D.C. Bar # 430876
Bruce P. Heppen
D.C. Bar # 252171
Michael K. Guss
D.C. Bar # 465171
600 5th Street, NW #2D-05
Washington, D.C.  20001
(202) 962-2373

Attorneys for Defendant WMATA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **DANA MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **C.A. No. 05-2342 (RMC)** |
| **v.** | ) | |
| | ) | |
| **WASHINGTON METROPOLITAN AREA** | ) | |
| **TRANSIT AUTHORITY, et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT WMATA'S MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

FACTURAL BACKGROUND

The Plaintiff Dana Miller was hired by WMATA as a Special Police Officer (SPO) on July 21, 2003.  See Defendant's Statement of Material Facts Not In Dispute  (S.M.F.) at ¶ 2. Pursuant to the  collective bargaining agreement, new employees are "considered probationary employees for the first three-hundred and sixty five (365) days of employment."  On January 16, 2004, the Plaintiff received her Mid-Year Performance Evaluation during her probationary period from Deputy Chief Daniel Hall, her immediate supervisor, informing her that she was charged with various violations of WMATA and Metro Transit Police/SPO Rules and Regulations, including excessive tardiness, not reporting to assigned post during an inclement weather emergency and an abandonment of her assigned post for up to 45 minutes.  See S.M.F. at ¶ 10.

Based on the number of infractions during the Plaintiff's first six months on the job and the accompanying instances of discipline, documented in her Mid-Year Performance Evaluation, Metro Transit Police Lt. Donna Tisdale and Metro Transit Police Captain Jeri Lee recommended

the Plaintiff's termination from WMATA. Special Police Lt. Johnson, who was not the

Plaintiff's supervisor, was not involved in this or any decision or recommendation to terminate

the Plaintiff. Deputy Chief Hall overruled the recommendations and elected to give the Plaintiff a

last chance to improve her work performance.  See S.M.F. at 12.  During their meeting on

January 16, 2004, Deputy Chief Hall specifically explained to the Plaintiff that, if she incurred

any further disciplinary actions within the next 90 days, while still on probation, her employment

with WMATA would be terminated.  See S.M.F. at 12.  The performance evaluation states in

relevant part:

> . . . [T]he purpose of a Mid-Year evaluation is to address the strengths and
> deficiencies of an employee.  The evaluation addressed numerous deficiencies …
> your overall performance to this point has been classified as less than desirable, In
> conjunction, it appears that the corrective actions taken up [sic] this point have had
> no impact on your performance. Therefore, you are hereby placed on notice that if
> your performance does not improved [sic] within the next ninety (90) days, you will
> be terminated from employment prior to the conclusion of your probationary period.


See Exhibit No. 6, ¶ 3 and 4.

Five days later, on January 21, 2004, Special Police Lt. Franklyn Johnson observed that

Plaintiff's assigned post at the Shady Grove S & I Yard was unmanned, with a combination

Television/Radio on the counter in violation of SPO General Post Instruction No. 10.  See S.M.F.

at 13.  General Post Instruction No. 10 specifically prohibits officers from having a television on

the post at any time, regardless of whether or not it is turned on.  See S.M.F. at ¶ 5.  The Rule

was amended to include combination Television/Radios.  See S.M.F. at ¶ 7.  The Plaintiff

received a copy of the General Post Instructions shortly after she was hired and copies of these

instructions are posted at each post location.  See S.M.F. at 4.

4

When the Plaintiff returned to her unmanned post, Lt. Johnson inquired about the

combination Television/Radio on her desk, and the Plaintiff admitted in writing that the item

belonged to her. See S.M.F. at 14.  In the memo, the Plaintiff wrote:

> Lt. Johnson came to [sic] booth at Shady Grove and saw that I had a TV/Radio in
> my booth [sic] he explained to me that it is not allowed in the booth and he
> needed a statement.  I was not using or watching the TV part of the radio.  I
> seriously do need my job.  I was not watching the TV part of my Radio.

See Exhibit 8.

Based on her violation of General Post Instruction No. 10 on January 21, 2004 and her prior "last

chance" warning, the Plaintiff was terminated from WMATA on June 1, 2004.  See S.M.F. at ¶

21-22.

The reason why the Plaintiff was terminated on June 1, 2004, a full 5-months after she

completed her written statement acknowledging that she had a combination Television/Radio at

her post, is the direct result of the events that unfolded on the evening of January 21, 2004.

According to the Plaintiff, after she gave Lt. Johnson her written acknowledgment of her rules

violation, Lt. Johnson offered to tear up the Plaintiff's confession in exchange for her coming

over his house later that evening.  See S.M.F. at ¶ 15.

Plaintiff failed to timely report Lt. Johnson's alleged proposition, as required by

WMATA's Sexual Harassment Policy.  Instead, the Plaintiff discussed the matter with her

mother, Deborah Miller, and the two decided to ambush Lt. Johnson at his home.  See S.M.F. at

¶ 17.  The Plaintiff and her mother followed Lt. Johnson to his home and confronted him with a

request to hand over the "paperwork" in which the Plaintiff admitted she violated General Post

Instruction No. 10.  See Id.  The Plaintiff and her mother left Lt. Johnson's house without

retrieving the statement.

Neither the Plaintiff nor her mother reported Lt. Johnson's conduct to WMATA police officials as required by WMATA's Sexual Harassment Policy, until after they left Lt. Johnson's residence without said "paperwork." This was found by WMATA's Office of Civil Rights to be a violation of WMATA's Sexual Harassment Policy by Plaintiff's mother Deborah Miller. See S.M.F. at ¶ 18.

The following day, the Plaintiff filed a sexual harassment complaint against Lt. Johnson with WMATA's Office of Civil Rights. The Office of Civil Rights began an investigation. The Office of Civil Rights asked Deputy Chief Hall not to take any disciplinary action against the Plaintiff for her possession of the Television/Radio in her booth on January 21, 2004 until after the conclusion of its investigation. See S.M.F. at ¶ 19.

On April 30, 2004, the Office of Civil Rights issued a memorandum finding sufficient evidence to support probable cause of sexual harassment by Lt. Johnson. The memo also found that the Plaintiff violated WMATA policies and procedures as wel. The Office of Civil Rights forwarded the matter to Chief Hanson for "appropriate response and action." Specifically, the memo summarized the Plaintiff's actions as follows:

> The evidence further shows that the Complainant [Plaintiff] has admitted to violating WMATA's policy. Through her own admission, the Complainant [Plaintiff] did have a television in the kiosk and knew that it was a violation to have it on post. Additionally, she admitted that she stated to Lt. Johnson that she could not afford another incident because it could result in her termination and asked whether he could give her a warning instead of a write up. The evidence shows that it was the Complainant [Plaintiff's] goal to obtain the incident report from Lt. Johnson and not to turn it in to the appropriate MTPD supervisors for the purpose of saving her job . . . [w]hile there are no specific Civil Rights violations by the Complainant [Plaintiff], the evidence does show that she [Plaintiff] violated other WMATA policies and/or procedures. Therefore, CIVR is forwarding this information to you for appropriate response and action.

See  Exhibit 10.

Three days later, by memo to Metro Transit Police Chief Polly Hansen, Deputy Chief Hall and Chief Hansen recommended the termination of the Plaintiff as a result of her having a Television/Radio on her post on January 21, 2004.  See  Exhibit 7.  The Plaintiff, acknowledging her receipt, signed Deputy Chief Hall's termination memo. Deputy Chief Hall retired shortly thereafter, and Deputy Chief Jerry Lee, reviewed Hall's recommendation, and ordered the Plaintiff's termination on June 2, 2004.  See S.M.F. at ¶ 22.

ARGUMENT

A. The Legal Standard for Summary Judgment

Summary judgment shall be entered when the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, if any, show that there is no genuine issue as to any material fact.  See Fed. R. Civ. P. 56.  Material facts are those "that might affect the outcome of the suit under the governing law."  See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact is in dispute, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in her favor."  See Id. at 255.  Where the nonmovant bears the burden of proof, the nonmovant may not rely on conclusory allegations, but must present specific facts from which a reasonable jury could conclude in the nonmovant's favor.  See Williams v. Verizon Washington, D.C., Inc., 266 F. Supp.2d 107, 115 (D.D.C. 2003).

7

B. Plaintiff's Alleged *Quid Pro Quo* Claim of Sexual Harassment Fails For Lack Of Causation.

The Plaintiff cannot make a prima facie case of *quid pro quo* sexual harassment because she cannot show a causal connection between her refusal to submit to Lt. Johnson's demand and her termination. In addition, she cannot show that WMATA's reasons for terminating her employment were pretextual.

In twin 1998 decisions, the Supreme Court clarified the area of Title VII litigation dealing with sexual harassment. Faragher v. Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In general, *quid pro quo* relates to sexual harassment through threats of retaliation that are actually carried out. See Gary v. Long, 59 F.3d 1391, 1395 (D.C. Cir. 1995). If there is no tangible employment action, "bothersome attentions or sexual remarks that are sufficiently severe or pervasive" can create a hostile work environment. See Ellerth., 524 U.S. at 751. However, although the concepts of hostile work environment and *quid pro quo* sexual harassment are useful ways to distinguish between discrimination claims, they are not always useful. See Id. at 752.

In order to establish a *prima facie* case of sexual harassment under a *quid pro quo* claim as alleged in Count I of the Complaint, the Plaintiff must show that (a) she is a member of a protected class, (b) she was subject to unwelcome overtures because of her sex, (c) and she suffered a tangible job detriment as a result of her refusal to submit to the demand of the supervisor. See Williams v. Verizon Washington, D.C., Inc. 266 F.Supp2d. at 120. Essentially, in order for a plaintiff to prevail, she must show that there is a causal connection between her refusal to submit to a supervisor's demand and an adverse employment action.

8

See Ellerth, at 753-54.  See also Williams at 120. (quoting Gary v. Long, 59 F.3d 1391, 1395 (D.C.Cir. 1995)) (to prove *quid pro quo* sexual harassment, adverse consequences must follow as a result of employee's refusal to submit to sexual advances.)

Upon such a showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged adverse action.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-4 (1973).  If an employer states a legitimate non-discriminatory reason for the discipline, the employee must prove that the stated reason is pretext.  See McDonnell Douglas at 804-5.

"When there is no evidence to support a connection between the individual who decides on discipline and the individual who engaged in the alleged harassment, there is no actionable claim to redress the discipline" and, accordingly, the claim fails for lack of causation.  See Williams at 122.  In order to show a causal connection in this instance, the Plaintiff must show that the individual who engaged in the alleged harassment participated in the decision to terminate the Plaintiff.  See Id.

The Plaintiff was terminated from her SPO position with WMATA for her admitted violation of General Post Instruction No. 10, which prohibited Television/Radio combinations on post.  Lt. Johnson observed the Plaintiff's violation of that post instruction before the alleged overture to the Plaintiff.  The Plaintiff admitted to her violation of Instruction No. 10 in a statement written by her prior to the alleged overture to the Plaintiff. Therefore, the Plaintiff cannot show that she was terminated for refusing to submit to Lt. Johnson's overture because the violation of WMATA policy, for which she was terminated for, occurred before Lt. Johnson allegedly made that overture.

It is undisputed that Lt. Johnson did not participate in the termination decision of WMATA because he was not the Plaintiff's supervisor. Lt. Johnson was not sent down to the Plaintiff's post to supervise her. He was present in the area to lay down mousetraps to control the rodent problem. Plaintiff's immediate supervisor, at the time, was Deputy Chief Hall, who alone had the power to discipline the Plaintiff.

Deputy Chief Hall gave the Plaintiff a final chance to improve her job performance by overriding termination recommendations made by Metro Transit Police Lt. Tisdale and Metro Transit Police Captain Jerri Lee. Special Police Lt. Johnson was not one of those supervisors. At the time of the incident in question, the Plaintiff had been told already, in writing, that any further rule violations would lead to her termination.

On December 29, 2003, Deputy Chief Hall, with the consent of the Plaintiff, rescheduled a recommended one-day suspension of the Plaintiff, for her fourth incident of tardiness, from January 11, 2004 to February 12, 2004, presumably a date more convenient to the Plaintiff. See S.M.F. at ¶ 8, See also Exhibit 4. Deputy Chief Hall also rescheduled the Plaintiff's recommended two-day suspension without pay, for being AWOL from her post for two hours, to a one-day suspension without pay effective February 5, 2004. See S.M.F. at ¶ 9, See also Exhibit 5.

Deputy Chief Hall also overruled the recommendation by his front line supervisors of Plaintiff's immediate termination in her Mid-Year Evaluation by giving the Plaintiff one last chance to improve her work performance. See S.M.F. at ¶ ¶ 10-12. See also Exhibits 6, 13 and 16 at ¶ 26. In fact, Deputy Chief Hall reiterated that, if the Plaintiff received "any type of disciplinary action within the next ninety (90) days, it would mean her termination."

Id.

The Plaintiff ignored Deputy Chief Hall's warning by violating General Post Instruction No. 10 only five (5) days later. The Plaintiff admitted to the violation and has acknowledged that the violation occurred before Lt. Johnson allegedly propositioned her. See S.M.F. at ¶¶ 14. See also Exhibit 8 and 10. There is no evidence that Lt. Johnson recommended the Plaintiff's termination or participated in any way in the decision to terminate the Plaintiff. In fact, Lt. Johnson was himself terminated based on his conduct on January 21, 2004 and was in no position to influence the decision to terminate the Plaintiff. Rather, the undisputed evidence shows that Deputy Chief Hall decided to terminate the Plaintiff because of her admitted violation of the General Post Instruction No. 10. The Plaintiff has not produced any evidence, other than the Plaintiff's bald allegations, that the Plaintiff's termination was for any other reason other than her violation of the post rules on January 21, 2004, and her direct disobedience of Deputy Chief Hall's final warning.

More importantly, the Plaintiff cannot show that WMATA's legitimate, non-discriminatory reason to terminate her was pretextual because she admitted to the very violation for which she was terminated. See Williams at 122 (Plaintiff cannot show that employer's legitimate, non-discriminatory reason for her suspension and termination was pretextual because she admitted to engaging in the conduct for which she was disciplined.) See also Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180. 1183 (D.C.Cir. 1996)(Reason for discipline must be "phony.")

The Plaintiff cannot show that she was discriminated against because of her sex. Deputy Chief Hall gave the Plaintiff chance after chance to improve her job performance,

11

however, the Plaintiff failed to heed Deputy Chief Hall's warning by admittedly violating WMATA policy 5-days after being given a final warning to change her act. There is no evidence that the Plaintiff was subjected to any repeated or consistent sexual discrimination until Lt. Johnson's alleged overture, which was made after the Plaintiff had already committed the violation that justified her termination.

Plaintiff seeks to obtain immunity from termination based on her extensive rules violations because of Lt. Johnson's wrongful conduct, thus trying to improve her situation. This is inconsistent with Title VII law.   One of the purposes "of Title VII is to put a plaintiff in the same position he/she would have been in had the discrimination not occurred, not in a better position." See Harper v. Godfrey Co., 45 F.3d 143, 149 (7th Cir. 1995). There, the court noted that, regardless of whether the discrimination had occurred, plaintiffs would have been fired in early 1987 for their misconduct and accordingly disallowed their reinstatements. Similarly, in Iannone v. Frederic R. Harris, Inc., 941 F. Supp. 403, 411-412 (S.D.N.Y. 1996), the court noted that "Title VII plaintiffs should not be made more than whole; that is, they should not receive a windfall."   Accord, Duncan v. WMATA, 425 F.Supp. 2d 121, 128, fn. 3 (D.D.C. 2006).

The Plaintiff fails to establish a prima facie case of *quid pro quo* sexual harassment because there is no evidence of a causal connection between her refusal to submit to Lt. Johnson's overture and her termination.   Alternatively, the Plaintiff cannot show that WMATA's legitimate, non-discriminatory reason for her termination was pretextual.

C.  Plaintiff's Alleged Retaliation Claim Fails For Lack Of Causal Connection Between Plaintiff Engaging In Statutorily Protected Activity And Her Termination.

In order to establish a *prima facie* case of retaliation as alleged in Count III of the Complaint, the Plaintiff must show that (1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection between the two exists.  See  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) See also Williams at 122.   In addition, claims of retaliation are also governed by the McDonnell Douglas burden-shifting framework in that once a prima facie case of retaliation is established, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  See Holbrook v. Reno, 196 F.3d 255, 263 (D.C.Cir. 1999).  See also Duncan v. WMATA, 425 F. Supp.2d 121 (D.D.C. 2006).

An adverse employment action that follows fast on the heels of an employee's protected activity may establish causation in certain circumstances, however, employers need not suspend previously planned adverse employment actions upon discovering that the Plaintiff has engaged in statutory protected activity, "and their proceeding along lines previously contemplated, through not yet definitively determined, is no evidence whatever of causality."  Breeden at 272. Accord, Duncan v. WMATA  at 127.

In Breeden, a school district employee argued that she had been demoted in retaliation for filing a lawsuit alleging sexual harassment.  Id.  Her sole evidence of causation was temporal proximity:  she filed her suit on April 1, 1997 and, on April 10, 1997, her supervisor notified the union representative that he intended to demote her, an action that was not formalized until some time later.  Id. While the Ninth Circuit found causation in this sequence of events, the Supreme Court reversed, noting that even though the case was filed

13

on April 1, 1997, the supervisor did not learn of the suit until April 11, 1997, one day after announcing the demotion.  Id.

Because Breeden's supervisor could not have known about the protected activity at the time she initiated the adverse employment action, the Supreme Court found that there could be no causation even though the demotion did not take effect until after Breeden filed suit.  "[E]mployers need not suspend previously planned [employment actions] upon learning that a ... suit has been filed," the Court explained, "and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence of causation."  Id.;  See also Carter v. Greenspan, 304 F.Supp.2d 13, 30 (D.D.C. 2004)("Because his supervisors' ... intention to dismiss him predated his protected activity, his retaliatory discharge claim is illogical and must be dismissed."); and Trawick v. Hantman, 151 F.Supp.2d 54, 63 (D.D.C. 2001) (noting that plaintiff could not establish causation where "the termination process had already been initiated before his protected activities began.")

Under Breeden, so long as an employer takes steps to terminate an employee before he or she engages in protected activities, the Plaintiff cannot establish retaliation, even through the termination does not become final until well after those protected activities have begun.  See Duncan at 128.

Applying the Supreme Court's reasoning in Breeden to this case, the Court must conclude that the Plaintiff cannot establish causation.

WMATA made the decision to initially terminate the Plaintiff's employment in her Mid-Year Performance Evaluation, which was discussed with the Plaintiff on January 16,

14

2004.  See S.M.F. at ¶ 11, Exhibit 6 and 16 at ¶¶ 15, 25, 26.  WMATA decided to forestall

final action if the Plaintiff avoided any further rule violations.  The contingent decision to

terminate the Plaintiff was made by Deputy Chief Hall, a full 5 days before the alleged

overture by Lt. Johnson and 13 days before the Plaintiff complained to the Office of Civil

Rights.

It should be noted that the only protected activity, which the Plaintiff can identify, is

the filing of charges with WMATA's Office of Civil Rights and the EEOC, both of which

occurred subsequently.  As a result, she cannot establish a prima facie case of retaliation

because there is no basis for inferring a connection between her termination and her protected

activity.  See Brown v. Brody, 199 F.3d. 446, 452-53 (D.C.Cir. 1999).

The record already demonstrates that Deputy Chief Hall warned the Plaintiff that

another disciplinary action in her file within a 90-day period would result in her termination.

See S.M.F. at ¶ 12.  See also Exhibit 13, p. 26, ln. 3-18, Exhibit 6 and Exhibit 16 at ¶ 26.

The Plaintiff's fate was sealed the moment she committed her violation of General Post

Instruction No. 10 on the night of January 21, 2004 before being propositioned by Lt.

Johnson.

Plaintiff's immediate supervisor Deputy Chief Hall did not immediately discharge

the Plaintiff because he was asked not to take any disciplinary action against the Plaintiff

pending the outcome of the investigation by WMATA's Office of Civil Rights.  The decision

to terminate the Plaintiff was finalized after the Office of Civil Rights completed its

investigation, showing that there was evidence that the Plaintiff violated "other WMATA

polices and/or procedures" and that the Office of Civil Rights was forwarding those findings

to Deputy Chief Dan Hall and Chief Polly Hanson for appropriate response and action. See S.M.F. at ¶ 20. See also Exhibit 14.

The Plaintiff is unable to show that the legitimate, non-discriminatory reason for her termination was pretext. See Holbrook at 263. Because the Plaintiff admitted to violating General Post Instruction No. 10, WMATA's reason for terminating the Plaintiff was not pretext and the Plaintiff cannot offer any evidence that the decision to terminate her was pretext. See also Williams at 123. (Employee cannot rebut employer's non-retaliatory reasons for adverse action because the employee admitted to violation of work rules and insubordination that was the reason for the adverse employment action taken.)

Therefore, the Plaintiff cannot establish a prima facie case of retaliation because the decision to terminate her was substantiated before the alleged overture by Lt. Johnson and WMATA's non-retaliatory reason for terminating the Plaintiff was not pretextual.

D. Plaintiff Cannot Establish A Prima Facie Case Of Sexual Harassment Based On Hostile Work Environment

In order to establish a *prima facie* hostile work environment claim alleged in Count II of the Complaint, the Plaintiff must prove that "(1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile or offensive working environment and (5) the existence of respondent superior liability." See Williams at 124.

The principal significance of the academic distinction between *quid pro quo* and hostile work environment is to "instruct that Title VII is violated by either explicit or

16

constructive alterations in the terms and conditions of employment and to explain [that] the latter must be severe or pervasive." See Ellerth. at 752. Incidents of environmental sexual harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." See Faragher at 787  In order to determine if an environment is sufficiently hostile or abusive, the lower courts must look at all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." See Id. at 787-88. "Such conduct must be extreme to amount to a change in the terms and conditions of employment." See Id. at 788.

Although no affirmative defense is available when a supervisor's harassment culminates in a tangible employment action such as a discharge, demotion or undesirable reassignment, an employer may defend against a showing of hostile work environment caused by sexual harassment by demonstrating that there was no hostile work environment. See Williams at 116.

The Plaintiff has not alleged, nor has she presented evidence of any continuous, concerted and/or pervasive incidents of a hostile work environment that can be said to have altered the terms and conditions of her employment. In fact, the plaintiff only alleges a single episodic event, namely, the proposition by Lt. Johnson on the evening of January 21, 2004. "Harassment 'must be more than episodic;' to be pervasive, it must be 'sufficiently continuous.'" See Williams at 124. (quoting Faragher at 776 n. 1)

There are no other allegations or evidence of misconduct by Lt. Johnson which could be said to have altered the terms and conditions of the Plaintiff's employment. Therefore, the Plaintiff has failed to make a *prima facie* case of Title VII sexual harassment based on a hostile work environment because she has failed to show that there was a hostile work environment that altered the terms and conditions of Plaintiff's employment.

CONCLUSION

Plaintiff cannot establish a *prima facie* case of *quid pro quo* sexual harassment because there is no causal connection between her refusal to submit to Lt. Johnson's sexual overtures and her eventual termination. Plaintiff cannot show that WMATA's legitimate, non-discriminatory and non-retaliatory reason for terminating her employment was pretext. The Plaintiff cannot show a causal connection between her engagement in statutory protected activity and her termination, because the decision to terminate the Plaintiff was contemplated, and in process, before the Plaintiff engaged in statutory protected activity. Finally, the Plaintiff has not presented any evidence of a hostile work environment that was sufficiently continuous, concerted, and pervasive enough to have altered the terms and conditions of Plaintiff's employment.