DEFENDANT'S EXHIBIT 1-12

CRS, Inc.  1-800-848-4007
EXHIBIT #
A-14

# M E M O R A N D U M

**SUBJECT:** TRAINING DOCUMENTS    **DATE:**

**FROM:** SIGNED BELOW

**TO:** MTPD-Lt. Donna R. Tisdale
Commander, Yards & Facilities

IN REPLY
REFER
TO:

*I have received a copy of the following training documents:*

*1. General Post Instructions*
*2. Special Police Rules & Regulations*
*3. Metrorail Safety Rules & Regulations (General Rules & Rules of Conduct)*
*4. General Order - SPO 225 (Appearance, Uniforms & Equipment)*
*5. General Order - SPO 230 (Tardiness)*
*6. Post Name & Location List.*

_____    005529    7/23/03
*Signature*    ID #    *Date*

Washington
opolitan Area
sit Authority

*Exhibit No. 1*

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
OFFICE OF TRANSIT POLICE AND SECURITY
PROTECTIVE SERVICES BUREAU

GENERAL
POST INSTRUCTION

1.  <u>All</u> communications for all post will be through the PSB
    Special Police Operations Center.  Upon reporting to your
    post you will call the Operations Center by dialing
    202/962-1909 or 202/962-1386 and report that you are on
    duty.  Thereafter, you will call every hour on the hour
    until such time as you report off duty.

2.  Officers assigned to Metrorail Stations or Metrorail Yards
    must consider the tracks energized at all times.

3.  All visitors, including tour groups, must be escorted or
    cleared by an authorized Transit Authority employee at all
    times, and will be required to sign in and out.

4.  All WMATA personnel desiring access to this facility will
    display their valid WMATA identification card.  All non-
    WMATA persons desiring access will have proper
    authorization, be identified and complete the visitors
    form.

5.  Until instructed otherwise, locations under construction
    are designated hard hat areas for all personnel at all
    times.

6.  Special Police personnel will not receive or sign for
    deliveries at any of the facilities.  Personnel making
    deliveries/pick up, will be referred to Authority
    employees responsible for same.

7.  You are to prepare reports of all unusual incidents prior
    to going off duty.

8.  You must be watchful for unusual activities or occurrences
    in your area of responsibility.  If you are suspicious
    about an event or a person, report your suspicions to your
    Supervisor immediately.

9.  Allow no one to loiter in or around your post.

10. You will not have televisions, radios, cassette players,
    reading materials or similar items other than authorized
    instructions on your post at any time.

*Exhibit No. 2*

01/05/2005 WED 10:40 FAX 2029625635        QEAS                                ☒004

## RULES AND REGULATIONS

Every WMATA employee is expected to follow the rules of good deportment and to observe the regulations that pertain to his/her job, but the highest order of conduct and obedience of all is expected of the Special Police officer.

1.  Special police officers are required to file their home address and telephone, or the number of a telephone where they can be reached in case of an emergency, with TPAS. This information must be furnished on the first day the officer reports for duty.

2.  If an address or telephone number is changed, your Supervisor must be informed of the change within 24 hours.

3.  Special police officers must carry their official identification at all times.

4.  If asked to furnish his/her name and position, the officer must do so politely and without hesitation.

5.  Except in emergency, 7.50 hours, plus one half hour for lunch, constitutes a regular tour of duty. The hours of duty for each shift (unless otherwise prescribed) are:

        FIRST SHIFT        2300-0700 HOURS
        SECOND SHIFT       0700-1500 HOURS
        THIRD SHIFT        1500-2300 HOURS

6.  Special police officers must report to their assigned posts in time to relieve the officers whose tour of duty are just ending. Since this position requires around-the-clock service, an officer who is to be relieved by another must stay at his post until his relief arrives.

7.  Special police officers are required to work 5 days each calendar week. (The calendar week begins on Saturday and ends with Friday). Each tour of duty is 7.50 hours long, so the workweek totals 37.50 hours. A weekly schedule showing the 5 days each officer is to work and the 2 days he will have off are prepared and posted at least three days in advance of each workweek.

8.  The officer on a "one-man" post may at times, have to eat lunch while on his post.

RULES AND REGULATIONS
Page 2

9.  Although the officer is normally expected to be on duty only
certain regular hours, he/she must be available for duty at
any time, day or night, if there is an emergency, and is
called, he/she must report for duty immediately.

If, because of an emergency or some other justifiable reason,
an officer is required to work more than 37.50 hours in a
week, the officer will be paid overtime; if he/she chooses,
however, will be given, if possible, compensatory time off
instead of overtime pay.

10.  Special police officer reliefs have to be carefully scheduled
to give around-the-clock service. The officers who carry out
this schedule <u>must be</u> dependable, regular in attendance and
never absent from work without making advance arrangements
with the sergeant, except in the case of illness or extreme
emergency. If it is necessary to be absent without advance
approval, the officer must notify his/her supervisor, allowing
for sufficient time for the sergeant to secure proper relief.

11.  All requests for annual leave or time off will have to be
approved by the supervisor. These requests for time off will
be made at least three working days prior to the time
requested.

12.  If an officer becomes ill while on duty, he/she should inform
the supervisor on duty immediately.

13.  Special police officers will not leave their assignments
without being properly relieved, except in the case of an
approved emergency.

14.  If it is necessary to detail an officer from his regular shift
to another to take the place of someone who is having a day
off or who is on leave, the officer must accept the assignment
as normal duty. He/she will, of course, be returned to the
regular shift as soon as conditions permit.

15.  Officers must cooperate and work in harmony with each other
and with other employees at all times.

16.  Officers must be courteous, polite, patient, helpful and
considerate of others and their needs. Courtesy shown others
will create good will toward the officer and the Office of
TPAS.

RULES AND REGULATIONS
Page 3

17.  If on duty at a post where a chair is furnished, the officer must stand whenever approached and remain standing while answering questions, giving information, or talking on the telephone.

18.  While on duty the officer will give undivided attention to his job.      Long unnecessary conversations will distract his attention from his responsibilities, and must be courteously avoided.

19.  Reading, writing, and studying are not permitted while on duty, except as may be required in connection with the job.

20.  The use of cigarettes, chewing tobacco or snuff while on duty is not permitted. Members of the force will not smoke, nor carry unlighted cigars, pipes, or cigarettes in their mouths while in uniform where the same may be subject to view by the public except in such places specifically set aside for smoking when the above described actions are not prohibited by the law, the Authority and/or department regulations.

21.  Sleeping on duty is one of the most serious offenses an officer can commit.  The protection of WMATA's properties is his/her responsibility and the officer must always be alert. To be found guilty of sleeping on duty may result in immediate discharge.

22.  The use of intoxicants or narcotics while on duty is not permitted, and no one will be permitted to enter on duty or continue on duty when under their influence. Any violation of any part of this rule will result in severe disciplinary action.

23.  Insubordination is an unpardonable offense. Any officer who refuses to carry out a lawful order of his/her supervisor or who is abusive or insolent in attitude or remarks to them, is guilty of insubordination, and is subject to severe disciplinary action.

24.  Failure to obey the special police regulations constitutes an offense which may require severe administrative action.  The following are given as examples of such offenses:

U1/U3/ZUU5 WED 10:41 FAX 2029625635        QEAS                                    @007

RULES AND REGULATIONS
Page 4

Negligence in the Performance of Duty: Unlawful or unnecessary use or loss of weapons or equipment; sleeping on duty; making false reports; leaving his/her post or assignment without being relieved; lounging; loafing and not being within the vicinity of the post assigned, or otherwise avoiding the duties of his/her post or assignment; inattention to duty; carelessness; failure to make assigned patrols; failure to perform duty as the situation requires; evading responsibility; failure to report or state the truth regarding violations of regulations or orders.

Conduct Unbecoming an Officer: Discourtesy to visitors, fellow employees; insolence; disorderly conduct; disrespect for the flag; use of coarse, profane, insolent or threatening language; thieving; immoral conduct; violation of any criminal law; drinking or using narcotics while on duty; any action which at any time would serve to bring discredit to the Office of TPAS.

Unsatisfactory Attendance: Absence without permission (AWOL) or without reporting in as required by the special police regulations; unscheduled absences so frequent as to indicate that the employee is undependable.

Insubordination: Refusal or unwillingness to accept or carry out orders; insolence; threats of violence; mutinous or disrespectful attitude.

Daniel D. Hall
Deputy Chief
Protective Services Bureau
Metro Transit Police
  and Security

# R O U T I N G    S L I P

*NZWC*



### OFFICE   OF TRANSIT POLICE & SECURITY
### *Special Police Operations*

TO:   Capt. D. Rice    _____

Lt. M. Smith    _____

Lt. G. Dobbins    _____

**All SPO Sergeants**    _____

_____    _____

_____    _____

☐ Approval                    ☐ Signature

☐ As Requested             ☐ Your Comment

☐ Necessary Action       ☒ **Your Information**

☒ **30 Day trial of personal radios:** _____

Remarks:

For the next thirty (30) days, Special Police personnel will be allowed to have a **radio** on post, under the following conditions.

1.    Volume must be kept low enough that only you can hear same.

2.    No radios at the JGB Lobby, B-1 and B-2 post Monday Through Friday, between the hours of 0600 and 1800 hours.

3.    Absolutely, no combination Radio/Televisions on post.

4.    No Boom Boxes (Nothing that will draw attention to the post.)

In order to maintain this privilege at the conclusion of the thirty (30) day evaluation period, it must be shown that the use of a radio, does not interfere with your daily duties.

Washington
Metropolitan Area
Transit Authority

*Exhibit No. 3*

FROM:    **Deputy Chief Daniel D. Hall**    DAT

# M E M O R A N D U M

**SUBJECT:** Radios on Post                              **DATE:** May 10, 2000

**FROM:** MTPD - Deputy Chief Daniel D. Hall

                                                                    IN REPLY
**TO:** MTPD - All Special Police                         REFER
Personnel                                                         TO:

On August 10, 1998, I implemented a thirty (30) day trial run of allowing radios on post. To date, this procedure has not been finalized as accepted or rejected. I am pleased to announce that to date there has been no complaints or reports of abuse. Therefore, SPO personnel will be allowed to continue having radios on post with the same conditions as initially announced.

1.   Volume must be kept low enough for only you to hear.
2.   No radios at the JGB Lobby, B-1, and B-2 post, Monday through Friday, between the hours of 0600 and 1800 hours.
3.   Absolutely, no combination Radio/Televisions on post.
4.   No Boom Boxes (Nothing that will draw attention to the post.)

Just as a matter of information, Televisions are strictly prohibited on all post, regardless of the tour of duty. Captain Rice will ensure that changes are made to the post orders reflecting the change in policy as it pertains to radios. Thus far, the use of a radios has not interfered with the daily operations. Let's keep it that way. Thank you for your cooperation in this matter.

AX-4

# M E M O R A N D U M



**SUBJECT:** Notice of Suspension    **DATE:** December 29, 2003

**FROM:** MTPD - Deputy Chief Daniel D. Hall
12/28/03

**TO:** MTPD - Special Police Officer
Dana Miller

IN
REPLY
REFER
TO:

A review of the attached investigative report indicates that on Wednesday, December 10, 2003, that you were not at your assigned duty assignment at 1500 hours. The report shows that you reported to the Shady Grove S & I yard at 1510 hours. This is your fourth (4th) such tardiness within the past three (3) months.

The investigative report was comprehensive and sufficiently documents the findings and recommendations. I have therefore approved recommendations that you receive a one (1) day suspension without benefit of pay or, compensation effective ~~January 11, 2004.~~ February 12, 2004 PG) 1/28/07 D.m) Miller +

You are advised that the disciplinary actions imposed in this instance will impact unfavorably on possible future opportunities as well as gaining permanent employment status. Future violations may result in more severe disciplinary action, up to and including termination.

In the future, you are expected to upgrade your performance and sense of responsibility to levels required for a member of the MTPD, Special Police Operations.

A copy of this correspondence will be placed in your service file.

**Washington Metropolitan Area Transit Authority**

I have read this report and I am
aware that a copy will be placed
in my personnel folder.

_(signature)_
Signature

12/29/03
Date

_(signature)_
Miller Signature

1/28/04
Date

Exhibit No. 4

# M E M O R A N D U M



**SUBJECT:** Notice of Suspension                    **DATE:** December 29, 2003

**FROM:** MTPD - Deputy Chief Daniel D. Hall
12/29/03

**IN REPLY REFER TO:**

**TO:** MTPD - Special Police Officer
Dana Miller

A review of the attached investigative report indicates that on Wednesday, December 10, 2003, that you were not at your assigned duty assignment at 1500 hours. The report shows that you reported to the Shady Grove S & I yard at 1510 hours. This is your fourth (4th) such tardiness within the past three (3) months.

The investigative report was comprehensive and sufficiently documents the findings and recommendations. I have therefore approved recommendations that you receive a one (1) day suspension without benefit of pay or compensation effective ~~January 11, 2004.~~ February 12, 2004 D.D. 1/28/04 D.m.
Miller

You are advised that the disciplinary actions imposed in this instance will impact unfavorably on possible future opportunities as well as gaining permanent employment status. Future violations may result in more severe disciplinary action, up to and including termination.

In the future, you are expected to upgrade your performance and sense of responsibility to levels required for a member of the MTPD, Special Police Operations.

A copy of this correspondence will be placed in your service file.

**Washington Metropolitan Area Transit Authority**

I have read this report and I am
aware that a copy will be placed
in my personnel folder.

_Dana Mos_
Signature

12/29/03
Date

_Dana Miller_
Miller Signature

1/28/04
Date

Def Exh 4

# M E M O R A N D U M



**SUBJECT:** Notice of Suspension                    **DATE:** December 29, 2003

**FROM:** MTPD - Deputy Chief Daniel D. Hall
*No Hall*
12/25/03

                                    **IN**
                                    **REPLY**
**TO:** MTPD - Special Police Officer      **REFER**
Dana Miller                        **TO:**
D.m  1/28/04

A review of the attached investigative report indicates that on Thursday, November 18, 2003, you absented yourself from your assigned guard post at the Alexandria S & I Yard for approximately two (2) hours. D.m  4/28/04

The investigative report was comprehensive and sufficiently documents the findings and recommendations. I have therefore approved recommendations that you be suspended for ~~two (2)~~ one (1) *Miller+date* days without benefit of pay or compensation effective ~~January 15 & 16, 2004~~. February 5, 2004 DD 1/28/04 Dm 4/28/04 *Miller+Date*

You are advised that the disciplinary actions imposed in this instance will impact unfavorably on possible future opportunities as well as gaining permanent employment status. Future violations may result in more severe disciplinary action, up to and including termination.

In the future, you are expected to upgrade your performance and sense of responsibility to levels required for a member of the MTPD, Special Police Operations.

A copy of this correspondence will be placed in your service file.

**Washington**
**Metropolitan Area**
**Transit Authority**

**I have read this report and I am**
**aware that a copy will be placed**
**in my personnel folder.**

_____          _____
Signature                         Date  12/29/03

_____          _____
Signature  *Miller change*        Date  4/28/04

*Exhibit No. 6*

# M E M O R A N D U M



**SUBJECT:** Notice of Suspension                    **DATE:** December 29, 2003

**FROM:** MTPD - Deputy Chief Daniel D. Hall
12-29-03

                                            IN
                                            REPLY
**TO:** MTPD - Special Police Officer        REFER
        Dana Miller                          TO:
        D.M 1/28/04

A review of the attached investigative report indicates that on Thursday, November 18, 2003, you absented yourself from your assigned guard post at the Alexandria S & I Yard for approximately two (2) hours. D.M 4/28/04

The investigative report was comprehensive and sufficiently documents the findings and recommendations. I have therefore approved recommendations that you be suspended for ~~two (2)~~ One (1) days without benefit of pay or compensation effective ~~January 15 & 16, 2004.~~ February 5, 2004 DD 1/28/04 DM 4/28/04
Miller + Date

You are advised that the disciplinary actions imposed in this instance will impact unfavorably on possible future opportunities as well as gaining permanent employment status.  Future violations may result in more severe disciplinary action, up to and including termination.

In the future, you are expected to upgrade your performance and sense of responsibility to levels required for a member of the MTPD, Special Police Operations.

A copy of this correspondence will be placed in your service file.

**Washington
Metropolitan Area
Transit Authority**

I have read this report and I am
aware that a copy will be placed
in my personnel folder.

_Dana Miller_                    12/29/03
Signature                        Date

_Dana Miller_                    1/28/04
Signature Miller change          Date

Def Exh 5

A Exh 1

# M E M O R A N D U M

SUBJECT: Mid-Year Performance Evaluation        DATE: January 16, 2004

FROM: MTPD - Deputy Chief Daniel D. Hall
                                                             IN REPLY
TO: MTPD S/P Officer Dana M. Miller                  REFER
                                                                TO:
                        1/16/04

In accordance with WMATA guidelines, each employee receives a Mid-Year performance evaluation in order to identify their strengths and weaknesses. It is also important to note to employees who are in their probationary period, and specifically to members of Teamsters Local Union 639, that they must meet performance standards. Article 4, of the Agreement between WMATA and the Union obligates supervisors to notify probationary employees who are not deemed qualified, no later that 35 days prior to the completion of the probationary period.

Please find attached, the supervisory assessment of your job performance to date. As you will note, the supervisors charge that you have a problem with tardiness and the ability to perform your assigned duties in a professional manner (Abandonment of post). Your supervisors also point out the fact that all Special Police are classified as "essential personnel". This means that you will find a way to come to work during snow and other emergencies. The review also addressed your attendance and concludes with a recommendation of termination.

As previously mentioned, the purpose of a Mid-Year evaluation is to address the strengths and deficiencies of an employee. This is done with a view towards instilling a since of pride and responsibility in our employees. The evaluation addressed numerous deficiencies but failed to address the fact that you have on numerous occasions volunteered to work overtime on short notice. That not withstanding, your overall performance to this point has been classified as less than desirable. In conjunction, it appears that the corrective actions taken up this point have had no impact on your performance.

Therefore, you are hereby placed on notice that if your performance does not improved within the next ninety (90) days, you will be terminated from employment prior to the conclusion of your probationary period. You are expected to report for your assignments on time. Remain on your post, attentive to your duties, reduce your use of sick leave, and comply with WMATA's policies and procedures.

*shington
tan Area
luthority*

*Exhibit No. 6*

Dana M. Miller                                                                        July 23, 2003

NOTES:

01/15/04
The following areas are in need of improvement and must be brought into compliance with
WMATA and MTPD/SPO Rules and Regulations immediately.    *Dana Miller* 1/16/04
                                                          Signature          Date

1.  On 9/15/03, 9/22/03, 10/03/03 and 12/10/03, you reported late for your assigned tour of duty, in
violation of General Order 230.   These occurrences resulted in progressive disciplinary actions up
to and including a one (1) day suspension.    *Dana Miller*      1/16/04
                                              Signature          Date

You have continued to arrive late for work even after being warned and disciplined.    You have failed
to make the proper notifications when you knew you would be late.  This has caused undue hardships
upon your peers and superiors and caused unnecessary overtime.  *Dana Miller* 1/16/04
                                                                Signature      Date

2.  An investigation is pending in which you were AWOL for 45 minutes on 12/17/03. Should this
investigation be sustained it would further prove your unreliability.  *Dana Miller* 1/16/04
                                                                      Signature       Date

3.  You are aware that you are considered essential personnel, however, on 12/06/03, during a
severe weather emergency you contacted the Deputy Chief via his cell-phone in order not to report
for your assigned tour of duty.  *Dana Miller*      1/16/04
                                 Signature          Date

.   On 11/18/03, you abandoned  your assigned post at the Alexandria S&I Yard, thus you evaded
your responsibilities to secure the facility against unauthorized entry in violation of MTPD/SPO Rules
and Regulations; Rule #24.   You received a two (2) day suspension for these violations.   You have
failed to state the truth and refuse to take any responsibility for your actions.  *Dana Miller* 1/16/04
                                                                                  Signature      Date

Your attendance and sense of responsibility is such that you are deemed unreliable. It is in the best
interest of the Authority to terminate your employment.
                                              *Dana Miller*      1/16/04
                                              Signature          Date

# M E M O R A N D U M

**SUBJECT:** Violation of Post Instructions by Special Police Officer Dana Miller

**DATE:** May 3, 2004

**FROM:** MTPD- Deputy Chief Daniel D. Hall

**IN REPLY REFER TO:**

**TO:** MTPD - Chief Polly L. Hanson

## BACKGROUND:
On Wednesday, January 21, 2004, at approximately 1700 hours, Special Police Lieutenant (SP/Lt.) Franklyn Johnson, supervisor for the 3-11 shift, was tasked by his Commander, MTPD Lieutenant (Lt.) Donna Tisdale to respond to the Shady Grove S & I yard guard post to deliver two (2) mouse traps. When SP/Lt. Johnson arrived at Shady Grove, he found the post unmanned and observed a TV/Radio on the counter. (A check of the Special Police Duty Roster established that Special Police Officer (SPO) Dana Miller was assigned to the Shady Grove post for the 3-11 tour of duty.)

## OBSERVATIONS:
Special Police Lieutenant F. Johnson reports that at about 1700 hours on Wednesday, January 21, 2004, Lt. Tisdale instructed him to respond to the Shady Grove S & I Yard post and deliver two (2) mouse traps. Upon arriving at the post at 2000 hrs, he observed the post unmanned with a TV/Radio (turned off) in plain view on the counter. Moments later, SPO Miller returned to the post from the Operations building. When SP/Lt. Johnson inquired about the TV/Radio, SPO Miller acknowledged that it was hers. SP/Lt. Johnson then reminded SPO Miller that it was inappropriate to have a TV on post and that she was in violation of SPO orders then instructed her to write a letter. He went on to report that SPO Miller advised him that she had been placed on notice by Deputy Chief Hall and that she was to avoid any problems for ninety (90) days or otherwise be terminated. **(Attachment No. 1)**

In a written statement SPO Dana Miller, **(Attachment #2)** acknowledged having a television on post while assigned to the Shady Grove S & I Yard post. She reported that the television was a combination TV/Radio which was not on when observed by SP/Lt. Johnson. SP/Lt. Johnson questioned her about the TV, advised her that it was in contravention to post orders and directed her to write a statement. SPO Miller wrote that she told SP/Lt. Johnson that she could not afford to get into anymore trouble and if he could make it a warning because of the warning letter she had received from Deputy Chief Hall.

*Exhibit No. 7*

Page 2 of 2

## CONCLUSIONS:

By her own admission, SPO Miller acknowledged having a TV/Radio on post. Her actions were in direct contravention of post orders and two written guidelines pertaining to radios on post. Each letter specifically delineates that no combination Radio/Television will be on post. **(Attachments 3 & 4)** This violation occurred on January 21, 2004, five (5) days after SPO Miller signed and received a Mid Year Performance Evaluation letter advising her that her overall performance to that point has been less than desirable. Moreover, the letter placed SPO Miller on notice that termination of employment would occur if she received one more discipline within ninety days, of receipt of the letter.

### Recommendation:

| | |
|---|---|
| **Charge #1** | Violation of WMATA Special Police General Post Instruction, No. 10, "You will not have televisions, radios cassette players, reading materials or similar items other than authorized instructions on your post at any time." |
| **Specification #1** | On January 21, 2004, SPO Dana Miller, working the 1500 to 2300 hours tour of duty at the Alexandria S & I Yard with an unauthorized television on post. **SUSTAINED** |
| **Recommendation #1** | **Termination** |

This recommendation of termination is for Just Cause, during Officer Miller's probationary period based upon continued unsatisfactory performance.

Attachments:   As Stated

I HAVE READ THIS REPORT
AND I AM AWARE THAT A
COPY WILL BE PLACED IN
MY PERSONNEL FOLDER.

SIGNATURE/DATE

# M E M O R A N D U M



SUBJECT: TV/Radio in booth     DATE: 11 21 /04

FROM: MTPD-OFC. Miller

TO: MTP- LT. Johnson

IN REPLY
REFER
TO:

Lt. Johnson came to booth at Shady Grove and saw that I had a TV/Radio in my booth he explained to me that it is not allowed in the booth and he needed a statement. I was not using or watching the TV part of the radio. I seriously do need my job. I was not watching the TV Part of the radio.

OFF D. Miller

Washington
opolitan Area
nsit Authority

Exhibit No. 8

68 Certified from
Dana Miller on 2-6-04
Capt. GFA

My Statement (pg 1)    30 Jan 2004

On Jan. 21 I Dana M Miller was working at Shady Grove Railyard on the 3-11pm shift. At approx. 1915 hrs I called downtown on ext 2426 and left a message that I was going to the restroom. I returned back to the booth within 10 min. and Lt. Johnson was reading my paperwork. When I saw him reading my papers I took them from him. I felt like it was inappropriate for him to be reading my papers because there are only 3 papers that the Sgt's are supposed to sign and look at and that is the visitors log, vehicle exit log, and equipment check sheet. The papers that he was reading were not any of those.

Lt. Johnson told me that he laid down a trap for the rats and showed me one under the desk. As he stood up he brushed his head against the desk. I told him that he had woodshavings in his hair and then he brushed his hair a few times and asked me was it gone and I told him yes.

Lt. Johnson told me that I had to write a statement for the TV/Radio that I had in the booth. I told him that I was not watching the TV part and that I was only listening to the radio (note that n ther the radio nor the TV was on when he arrived) He then showed me a policy that indicated that I could not have that device in the booth. He then said that he had to write up two other officers for having TV's and he needed a statement from me.

Exhibit No. 9

My Statement (pg 2)

I then told Lt. Johnson that I couldn't afford to get into anymore trouble and could I have a warning. I also told him that I have made a lot of improvement. I also said that I'm trying to move into my own place by April 1st and if I don't have a job that would be hard. I then told him that I would throw the device away and reminded him that I was not watching the TV part of the device.

A man then came to the booth with some materials to deliver and Lt. Johnson escorted him into the yard. While Lt. Johnson was gone I wrote the statement as he asked. When he returned to the booth he asked me if I was OK and I said NO, I need my job and I feel that this will be the end of my job. (the cause of me losing my job)

Lt. Johnson stated that it was hot in the booth, lets go outside. We did and that is when he asked me what I was doing when I got off work. I told him I had to pick up my son and go home. He said "you do all that driving?" I said yes. He then asked me what time do I finish doing all that. I told him that I normally get home about 1215 to 1230 am. He then told me that he doesn't like the discipline part of his job. He then asked me what was I doing when I got finished dropping my son off. (the look along with the question made me feel

My statement (pg 3)

Very uncomfortable) I said nothing why. He then told me that he lives off of Bock Rd and asked if I knew where that is. I said yes because me and my father used to live off Bock Rd. He then said we could meet and he would then give me my paper work (statement that I wrote) I then repeated what he said which was "if i meet with you, you would give me my paperwork". He said give me ?? and he would give it to me personally to rip up. I then noticed he had a ring on his finger and asked aren't you married. He said that his wife is in Carolina.

Lt. Johnson asked me if I knew where the Lowest Price Gas Station was on Allentown Rd. I told him that I did. He told me that he didn't want me to get lost and for me to meet him there and to follow him from there. I said OK and went back to the booth. I felt very nervous and uneasy. and de

While in the booth the phone rang and at that time Lt. Johnson told me that if it was Lt. Tisdal he was not there. The call was from Lt. Tisdale and we spoke about whether the traps were laid and spoke about rats/mice. She asked me was Lt. Johnson there and I told her no while I was looking at Lt Johnson who was making gestures saying that he wasn't there. She advised that she had had trouble contacting him. The conversation ended by me saying

My Statement (pg 4)

thank you for the rat traps.
Lt. Johnson still did not leave, he picked up my cell phone that was lying on the desk and made comments about how he liked it. Then he said "Wow you sure do make a lot of phone calls" and I then took the phone because that let me know that he was scrolling through my phone information. He stated that he had two more posts to go to and he walked towards the door, before he left he said "You're going to come right? I said (in a low tone) "Yeah I'ma come" and he said "You will be" with a smirk on his face. He then left. It was exactly 2100 hrs

While on my way home from picking up my son my phone rung at approx 12:17 hrs. The call was from Lt. Johnson (301-537-____) to tell me he had just left the office and that he was going to meet me at the Lowest Price at 12:50 instead of 12:30. I said O.K.

I picked my mother up from the Kaiser Permanente because I wanted her to ride with me, at approx 12:30. My mother and I arrived at the Lowest Price Gas Station at approx 12:42 am and Lt. Johnson called my phone again. He asked me to pull up to Allentown Rd and Back Rd and to follow him from there. I said alright. Then he said never mind, just stay at the gas station. I told him that I had already pulled out of the

My statement (pg 5)

Station and I noticed a jeep put its brakes on real hard. I asked him was that him that put his brakes on and he said yes. At that time the phone connection was lost. He called me back and I told him I was on Back Rd with my hazard lights on. After 3 or 4 min I saw a vehichle but I wasn't sure if it was his so I asked my mother if I should call him to see if we were following him. She was un sure at first and then said yes. That was the only time I called his. I had his number because when he called my cellphone it showed up on my caller I.D.

We followed him to his home on Brown's Lane, 2310 or 2013 Brown's Lane. He pulled into the driveway and I parked in front by a fire hydrant. He asked me why didn't I park in the driveway and told him that I dont park in peoples driveways. He told me that I couldn't park right there because of the fire hydrant, so I pulled up to the front of his house with the front of my vehichle directly across from the street sign that said Brown's Lane.

Lt. Johnson left the door ajar so I went in he said let me take your coat while unbuttoning the top button of my coat I asked "where's the paperwork?" He then said (grinning) let me take your coat while unbuttoning the second

My Statement (cont.)

button and slid his hand under the coat while groping my left breast with his right hand for close to three seconds

My mother rang the door bell and he walked over to the door & immediatly opened it and said "Hey come on in" looking nervous. She said NO this ends now and I quickly left the home. He said what ends now, and my mother said that there are EEO laws against this. And she said "You have some paperwork for her". And he stumbled on his words, looked at me in a scary way and walked towards the back of his house. My mother and I waited for approx 15 to 20 seconds and I felt that we should leave be- cause there was no telling what he was going to do. I felt scared.

When we left my mother called chief Hall's answering machine and told him that we left 2013 or 2310 Brown Lane.

Dana Miller
Dana Miller

# M E M O R A N D U M



**SUBJECT:** Letter of Termination                **DATE:**   June 1, 2004

**FROM:** MTPD - Chief Polly L. Hanson

**TO:** MTPD - Special Police Officer Dana Miller

On January 16, 2004, a Mid Year Evaluation memo was issued denoting unsatisfactory performance demonstrated during your probationary period and advised against additional disciplinary actions within a ninety day period. Violations of the terms of the Mid Year Evaluation directed that you would be terminated.  On Wednesday, January 21, 2004, you were found to be in violation of Special Police General Post Instruction No. 10, by having an unauthorized television on post.    Accordingly, I have approved recommendations that you be terminated from the employ of the Washington Metropolitan Area Transit Authority effective immediately. Delay in the issuance of this action was prompted by an internal investigation that was recently concluded.

**Washington
Metropolitan Area
Transit Authority**

I HAVE READ THIS REPORT
AND I AM AWARE THAT A
COPY WILL BE PLACED IN
MY PERSONNEL FOLDER.

SIGNATURE/DATE                6-2-04

Exhibit No. 10

# GENERAL ORDER
## Metro Transit Police

| Subject: Sexual Harassment | Number: 218 |
| --- | --- |
| | Effective: 09/01/98 |

## I. Purpose
This Order outlines the Department's sexual harassment policy.

## II. Policy
The Department strives to provide a work environment free from discrimination of any type. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on sex. The U.S. Supreme Court has ruled that same-sex sexual harassment is also prohibited by Title VII. Sexual harassment is a form of discrimination and will not be tolerated. A member whose conduct constitutes sexual harassment or an official who knowingly permits such conduct to occur will be subject to disciplinary action up to and including dismissal.

## III. Definition
A. Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors or other verbal/physical conduct of a sexual nature when:
1. submission to such conduct is made a term or condition of a member's employment, either explicitly or implicitly,
2. submission to or rejection of such conduct is used as a basis for employment decisions affecting a member, or
3. such conduct has the purpose or effect of unreasonably interfering with a member's work performance or creates an intimidating, hostile or offensive work environment.

B. Examples of conduct that may constitute sexual harassment include:
1. a demand for a sexual favor that is accompanied by a promise of favorable job treatment or a threat concerning the member's employment,
2. pressure for sexual favors, including

implying or threatening that a member's cooperation of a sexual nature (or refusal thereof) may have an effect on the member's employment (e.g. job assignments, wages, promotions, future employment opportunities), and/or
3. unwelcome conduct of an offensive nature (e.g. continual sexual propositions, uninvited physical contact, repeated oral or written vulgar or demeaning comments, repeated jokes of a sexual nature, posting, faxing, e-mailing of sexually explicit material) directed toward a member and/or others.

## IV. Procedures and Responsibilities
A. A member who believes he or she has been sexually harassed will, without delay, notify an immediate supervisor and report the act of harassment.
1. Members may report the act of harassment to the next higher level of supervision if the immediate supervisor is in any way involved in the harassment.
2. If the member feels that facts or circumstances make it inappropriate to file the complaint through the normal chain of command, he or she may utilize the Open Door Policy established by the Chief of Police.
3. If the member feels that facts or circumstances make it inappropriate to employ the Open Door Policy, he or she may report the matter directly to the Office of Civil Rights (CIVR).
4. The member reporting an act of harassment will provide the name(s) of involved parties, date(s)/time(s) of occurrence(s), exact nature of the

*Exhibit No. 11*

complaint and any action(s) taken by
the member to end the harassment.

B. Supervisors receiving a sexual harassment
complaint or who become aware of an
issue that could be discrimination will take
the issue seriously and remain impartial,
respectful and non-judgmental. Supervisors
will also:

1. respond immediately by meeting with
the member privately to discuss the
issue confidentially;

2. explain that issues of discrimination
may be investigated by CIVR;

3. advise the member of your obligation
to report the allegation to CIVR;

4. explain to the member that
confidentiality will be maintained to
the greatest extent possible;

5. ask clarifying questions for the purpose
of obtaining basic information:
- Who is involved?
- What was the offending behavior?
- When and how often has the behavior
occurred?
- What was the member's reaction?
- Were there any witnesses?

6. contact CIVR immediately after
meeting with the complaining member
and determine if interaction between
the complaining member and the
alleged wrongdoer(s) should be
limited;

7. not discuss the complaint beyond
CIVR and other supervisors involved;
and

8. submit a brief report to the Chief of
Police without delay.

Barry J. McDevitt
Chief

General Order 218
Page 2



**M metro**

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
OFFICE OF CIVIL RIGHTS
DISCRIMINATION COMPLAINT
(PLEASE PRINT OR TYPE)

RECEIVED
CIVR/EEO
WMATA

2004 JAN 28  PM 5: 24

Charge Number **373-03**     CHARGE OF DISCRIMINATION

TS Employee ☐
TA Employee ☐
Union Employee ☒

NAME: **Dana Miller**     HOME TELEPHONE NUMBER: (301) **856-8361**
301 526-7434-cell

STREET ADDRESS, CITY, STATE, & ZIP CODE:     OFFICE TELEPHONE NUMBER: (    )

**6300 Brooke Jane Drive, Clinton, MD 20735**

OFFICE: **Special Police**     EMPLOYEE NO. **005529**     POSITION: **Special Police Officer**

NAME OF DEPARTMENT: **MTPD**     OFFICE: **Special Police**     SUPERVISOR: **Lt. Franklin Johnson**     AND/OR OTHER PERSONS WHOM I ALLEGE DISCRIMINATED AGAINST ME

NAME AND OFFICE: **Shady Grove**     TELEPHONE NUMBER: **X41997**

BASIS OF DISCRIMINATION:

Color ___ Race ___ (Sex) Religion ___ Nat'l Origin ___ Age ___ ADA (Disability) ___ Retaliation ___ Other (please specify) ___

         **X**

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE: **1 / 21-22 /04**

                                                           month   Day   Year

**I was sexually harassed by Lt. Franklin Johnson when he requested a sexual favor in exchange for not ~~reporting an incident in which I~~ turning in paper work regarding a violation of policy. Specifically, Lt. Johnson asked me to meet him at a Gas Station near his house and then asked me to follow him home to 2310 Browns Lane Fort Washington, MD**

*Exhibit No. 12*

PAGE 1 OF 2

23.05A (8/93)

DESCRIPTION OF ALLEGED COMPLAINT :

**M** metro

Lt. Johnson gently grabbed my left breast while attempting to ~~take~~ take my coat in his house.

I affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

Signature of Complainant X _Dana M Miller_ Date: X 1/28/04

Print or type Name of Complainant X Dana M miller

Case Assigned: _Devin Waelker_     Date: _1/29/04_

PAGE 2 OF 2