DEFENDANT'S EXHIBIT 13-15

SHEET 1   PAGE 1

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
WASHINGTON, D.C.

```
                                   )
In the Matter of                   )
                                   )
LOCAL 689, AMALGAMATED             )
TRANSIT UNION, AFL-CIO             )
                                   )   Grievance of
        and                        )   DANA MILLER
                                   )
WASHINGTON METROPOLITAN            )
AREA TRANSIT AUTHORITY             )
                                   )
                                   )
```

Tuesday, January 18, 2005

The proceedings in the above-captioned matter were convened at the offices of Washington Metropolitan Area Transit Authority, 600 Fifth Street, Northwest, Washington, D.C. 20001, in the presence of Stan Ruddie, Court Reporter,

PAGE 2

commencing at 11:35 a.m., before:

LEROY CLARK, Arbitrator

APPEARANCES:

ON BEHALF OF WMATA:

LAURIE BAY, ESQUIRE
Washington Metropolitan Area Transit Authority
Office of Employee and Labor Relations
Department of Administrative Services
600 Fifth Street, N.W.
Washington, D.C.  20001
(202) 962-2326

ON BEHALF OF GRIEVANT:

E. LINDSEY MAXWELL, II
Beins, Axelrod, Kraft, Gleason & Gibson, P.C.
1717 Massachusetts Avenue, N.W., Suite 704
Washington, D.C.  20036
(202) 328-7222

PAGE 3

## CONTENTS

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| David Hall | 20 | 36 | 47 | 48 |
| Jerry Lee | 50 | 70 | 80 | 81 |
| Deborah Miller | 81 | 93 | -- | -- |
| Dana Miller | 103 | 119 | 123 127 | 124 |
| Diana Faison | 129 | 130 | -- | -- |
| David Hall (rebuttal) | 136 | -- | -- | -- |
| Jerry Lee (rebuttal) | 138 | 141 | -- | -- |

## EXHIBITS

| Joint Exhibits | Marked | Received |
|---|---|---|
| No.  1 (contract) | 5 | -- |
| No.  2 (Amendment to contract) | 5 | -- |
| No.  3 (Grievance Reporting Form) | 6 | -- |
| No.  4 (July 6 response from Ms. Faison to Mr. Lee) | 6 | -- |
| No.  5 (August 6, 2004 response from Mr. Edwards to Chief Hansen) | 6 | -- |
| No.  6 (Dereliction of Duty - Deborah Miller) | 103 | -- |
| Authority Exhibits | | |
| No.  1 (Memo from Deputy Chief Hall and Evaluation - Officer Miller) | 27 | -- |
| No.  2 (General Post Instruction) | 28 | 29 |

PAGE 4

| | Marked | Received |
|---|---|---|
| No.  3 (Modification - Special Order No. 10) | 29 | 30 |
| No.  4 (Memo from Deputy Chief Hall, dated May 10, 2000 regarding radios) | 30 | 31 |
| No.  5 (Memo from Deputy Chief Hall, dated May 3, 2004 regarding write-up of violations of post instructions by Officer Miller) | 31 | 33 |
| No.  6 (Memo from Officer Miller to to Lt. Johnson, dated January 21, 2004) | 32 | 33 |
| No.  7 (Letter of Termination from Chief Hansen to Officer Miller) | 53 | 54 |
| No.  8 (Letter from Ms. Faison, Teamsters 639, dated June 9, 2004 to Acting Deputy Chief J.K. Lee) | 68 | 70 |
| No.  9 (WMATA Sexual Harassment Policy) | 95 | -- |
| No. 10 (Statement of Deborah Miller) to Internal Affairs | 97 | 98 |
| No. 11 (Written Statement of Deborah Miller to Deputy Chief Hall, dated January 22, 2004) | 98 | 98 |
| No. 12 (Officer Miller's statement to | | |

Exhibit No. 13

1    MS. BAY: Okay, let [ ] take a look at that. We can
2  have an Executive Session between the three Arbitrators when
3  one party wants to have an Executive Session, and I would
4  like to call for an Executive Session.
5            ARBITRATOR CLARK: What does that entail?
6            MR. MAXWELL: Just the three of us talking.
7            MS. BAY: Just discussing what's going on.
8            [Recess.]
9            ARBITRATOR CLARK: On the record.
10           MS. BAY: At this point, we'd like to agree to some
11  additional Joint Exhibits before I put my witnesses on.
12           MR. MAXWELL: It's up to you. We can do it as we
13  go along, if you like.
14           MS. BAY: Okay, we'll do that. I'm going to call
15  Mr. Hall first.
16           ARBITRATOR CLARK: Are you going to do an opening?
17           MS. BAY: I'm not going to do an opening. I think
18  I covered the factual basis for her termination in my opening
19  on the procedural issues this morning. I don't have a need
20  to say any more about that.
21           MR. MAXWELL: I'd like to give mine, if there's no
22  objection.
23           MS. BAY: No objection.
24           ARBITRATOR CLARK: Certainly.
25           MR. MAXWELL: Good morning, Mr. Arbitrator, my name

---

PAGE 18

1  is Lindsey Maxwell. I represent the International
2  Brotherhood of Teamsters, Local 639. Local 639 is a party to
3  a Collective Bargaining Agreement with the Washington Metro
4  Area Transit Authority covering the Metro special police.
5           On or about January 21st, 2004, during the 3:00 to
6  11:00 evening shift, Officer Dana Miller, the Grievant, was
7  assigned the Shady Grove yard post to man a booth. While on
8  duty at that booth, she proceeded to make use of a
9  combination TV/radio.
10          Admittedly, Officer Miller knew that the use of
11  this device was against the employer's policy. Further, the
12  Grievant knew that the rule was hardly ever enforced by
13  management and was not considered a serious offense.
14          Around 8:00 p.m. that evening, Lieutenant Frank
15  Johnson, the supervisor, reported to the Shady Grove yard
16  post to deliver some mouse traps. When he arrived, he
17  noticed the TV/radio and instructed the officer that it was
18  against policy to have the device.
19          He went on to request that she write a letter
20  stating that she had violated the policy, which she did.
21  It's worth noting here that the Union is the recognized
22  exclusive bargaining agent for Officer Miller. It is well
23  settled in labor law that requesting an employee to engage in
24  an activity such as signing an official statement for use in
25  discipline without a Union representative being present could

---

1  be a violation of the spirit of the CBA.
2           In any event, Officer Miller did indeed follow the
3  instructions of her supervisor and complete the letter. She
4  indicated to Mr. Johnson that she was a probationary
5  employee, and requested that he give her an oral warning
6  instead of anything written, because she wanted her job.
7           It was at this point that Mr. Johnson asked Officer
8  Miller what she was going to do after work. He also told
9  Officer Miller that if she came to see him after work, he
10  would give her the writeup and she could tear it up.
11          A little after midnight that same night, Lieutenant
12  Johnson called Officer Miller's cell phone to arrange a
13  meeting. Because Officer Miller was wise enough to know that
14  Lieutenant Johnson's advances were sexual in nature, she got
15  her mother, another Metro employee, to hide in the back seat
16  to act as a witness.
17          Officer Johnson arranged for them to meet at a gas
18  station not far from his home, had Officer Miller follow him
19  to his home, and then requested that she come inside. It was
20  then that she got inside Lieutenant Johnson's home. He
21  fondled Officer Miller's breast and attempted to remove her
22  shirt. Officer Miller's mother then rang the doorbell and
23  confronted Lieutenant Johnson. Both Officer Miller and her
24  mother then left the home at that point.
25          It was shortly thereafter that Officer Miller filed

---

PAGE 20

1  charges for sexual harassment and an investigation ensued.
2  The results of the investigation found that there was
3  probable cause that Officer Miller was sexually harassed by
4  Lieutenant Johnson.
5           The day after the employer reached their conclusion
6  of there being probable cause, the employer terminated
7  Officer Miller. Article 11 of the CBA states that an
8  employer will not discriminate against an employee in
9  violation of an applicable law or regulation. However, in
10  this case, it is clear that Officer Miller was terminated in
11  retaliation for filing a claim of sexual harassment against
12  the employer.
13          Today, you will hear the testimony of this incident
14  from Officer Miller. You will hear how the investigation was
15  one-sided and insensitive. In addition, you will hear from
16  her mother, who witnessed the events leading up to that
17  meeting at Lieutenant Johnson's home.
18          Finally, you will see how the reason given for her
19  termination is a pretext, because others in the Department
20  were treated differently, not terminated for the same or
21  similar offenses; thank you.
22           ARBITRATOR CLARK: Okay, we can proceed.
23           MS. BAY: Would you like to keep the witnesses in
24  their seats where they are?
25           ARBITRATOR CLARK: Yes, if they can be recorded

---

Court Reporting Services, Inc.

**PAGE 21**

1   from there, that's fine.
2        MS. BAY: Are we swearing in?
3   WHEREUPON
4        DANIEL D. HALL
5   a witness of lawful age, was called for examination by
6   counsel for the Authority and, having been first duly sworn,
7   was examined and testified as follows:
8        DIRECT EXAMINATION
9   BY MS. BAY:
10   Q   Please state your full name for the record.
11   A   My name is Daniel D. Hall.
12   Q   What is your job position?
13   A   I am currently the currently the security manager
14   of the D.C. Water and Sewer Facility.
15   Q   How long have you been there?
16   A   Approximately six months.
17   Q   Were you previously employed by WMATA?
18   A   Yes, I was.
19   Q   For what period of time?
20   A   I was employed with the transit police for 28
21   years. I started on March 21, 1976. I retired the 2nd of
22   June, 2004.
23   Q   Tell us the positions that you held during your
24   career at WMATA.
25   A   I started out as an officer. I became a detective

**PAGE 22**

1   in Internal Affairs. I got promoted to sergeant. I went to
2   revenue for a little while and then detective sergeant in
3   Internal Affairs; lieutenant, mobile patrol; captain,
4   criminal investigations; deputy chief, field operations; and
5   deputy chief for the protective services bureau.
6   Q   How long were you deputy chief, the last position
7   you held?
8   A   I was promoted in 1995, so I think in 1996, I
9   became the commander or deputy chief of the protective
10   services bureau.
11   Q   You held that position until you retired in June,
12   2004?
13   A   Yes, ma'am.
14   Q   In that capacity, what employees did you oversee?
15   A   I was responsible for overseeing the special police
16   operations, the revenue operations and what they now classify
17   as the weapons of mass destruction, the technology group.
18   Q   Approximately how many employees would that
19   encompass under your supervision?
20   A   There were probably around 90 persons assigned to
21   the special police operations. There about 68 people
22   assigned to the revenue operations division, and three to the
23   weapons of mass destruction.
24   Q   What functions do special police officers carry
25   out?

**PAGE 23**

1   A   The special police are deemed the responsibility of
2   protecting WMATA's facilities. They are the first-line
3   defense. They are the personnel that are at the entrances of
4   the facilities. When I say facilities, that's the
5   headquarters here, the bus divisions, rail divisions,
6   controlling the passenger egress at the entry and exits of
7   the facilities.
8   Q   Of the Metro facilities?
9   A   Of the Metro facilities.
10   Q   How did they enforce those?
11   A   Their primary job is to sit there and check to make
12   sure that only authorized persons come on to the facilities
13   by checking their ID cards, logging in and logging out
14   vehicles, and checking packages when necessary.
15   Q   Are they commissioned officers?
16   A   Yes, they are. They are commissioned through the
17   D.C. Special Police Commission. They start out with a
18   security guard license. Then they get a special police
19   license, either an armed or unarmed license.
20   Q   Is there another section of the police force at
21   Metro, besides the special police officers?
22   A   The Metro transit police department, yes, which is
23   separate and distinct.
24   Q   And what do they do?
25   A   The transit police department is formed as a police

**PAGE 24**

1   agency. They work for Maryland, Virginia, and the District
2   of Columbia. They are the only tri-state police department
3   in the country. The special police are commissioned only
4   within the District of Columbia, and they can only take
5   action on properties owned, controlled, and operated by WMATA
6   on the facility.
7   Q   So the special police officers are assigned to
8   different posts?
9   A   They are assigned to specific posts such as your
10   rail yards and bus divisions and Headquarters.
11   Q   Is there a probationary period for new employees
12   hired as special police officers?
13   A   The contract stipulates that they have a one year
14   probationary period.
15   Q   And what is the process for terminating a
16   probationary employee?
17   A   The probationary period starts on the date of hire.
18   They have a year, and during the course of the year, their
19   supervisors give them an evaluation. They give them a free
20   evaluation. This is done mainly if the officers are not
21   performing up to standard. They get an evaluation. The
22   contract stipulates if they are to be terminated, that they
23   have to be notified 35 days prior to the end of their
24   probationary period.
25   Q   When was Ms. Miller hired by the Authority, do you

PAGE 25

1  recall?
2      A   I believe it was either June or July of 2003.
3      Q   What position was she hired for?
4      A   Special police officer.
5      Q   Now as the deputy chief, would you be aware of how
6  a special police officer was performing the functions during
7  a probationary period?
8      A   Yes, I routinely went out to the post.  But any
9  time any type of disciplinary action was submitted on any of
10 the officers, it had to come through my office.  I was the
11 final signature.
12     Q   If Ms. Miller was hired in June or July, what did
13 you know, if anything, about her performance during her first
14 five or so months on the job?
15     A   Her supervisor had sent an evaluation up, and it
16 listed several disciplinary actions, and they recommended
17 termination.
18     Q   I'm going to ask you to take a look at the second
19 page of this document here, and ask you if you recognize
20 that?
21     A   Yes, I do.
22     Q   Is that the evaluation from the supervisor you were
23 just referring do?
24     A   Yes, it is.  This was signed by Captain Myerson and
25 Lieutenant Tisdale.

PAGE 26

1      Q   Now take a look at the first page of that document,
2  please.  Do you recognize that, as well?
3      A   Yes, ma'am, that's a memorandum I wrote in response
4  to the mid-year performance evaluation submitted by her
5  supervisors.  As you can see on the mid-year performance
6  evaluation, they recommended for me to terminate.  It was in
7  the best interests of the Authority to terminate the employee
8  because of the disciplinary that had come up during the
9  course of her employment.
10         In lieu of termination, I gave Ms. Miller a second
11 chance or another chance, and I told her, you know, that the
12 supervisor had recommended termination.
13         Then I told her that she had to improve her
14 performance.  If she didn't have anything else in her
15 performance within the next 90 days, it would be all right.
16 But if anything was in her file, or if there was any type of
17 disciplinary action within the next 90 days, it would mean
18 her termination.
19     Q   Okay, the date on that is?
20     A   January 16th.
21     Q   Did you actually meet with Ms. Miller to give her
22 this document?
23     A   I did.
24     Q   And what day was that?  Did it happen on January
25 16th?

PAGE 27

1      A   On January 16.
2      Q   Tell us how that meeting went.
3      A   Well, I called Ms. Miller into my office.  She came
4  in and first I presented her with the mid-year evaluation
5  from her supervisor.  She sat there and she read it.
6          Then when she got to the last line and saw that it
7  recommended termination, she was sort of disappointed with a
8  look of disgust, I guess.  Then I turned around and I gave
9  her the letter that I had written superseding the
10 recommendation for termination.
11     Q   Did she have a reaction to that?
12     A   She was sort of happy.  A smile was on her face.
13         MS. BAY:  We'd like to introduce this as Authority
14 Exhibit 1.
15                      [Whereupon, Authority Exhibit No. 1
16                      was marked for identification.]
17         BY MS. BAY:
18     Q   Mr. Hall, during that meeting with Ms. Miller, did
19 she at any time raise any complaints about any of her
20 supervisors?
21     A   No, ma'am.
22     Q   At any time prior to this meeting on January 16th,
23 had she raised any issues or complaints?
24     A   I mean, she would say the supervisors were picking
25 on her, that they didn't particularly like her.

PAGE 28

1      Q   What names, if any, did she mention?
2      A   I think Lieutenant Tisdale.
3      Q   What are the rules for special police with regards
4  to having TVs while on duty?
5      A   A standard operating procedures stipulate that there
6  will be no televisions or radios on the guard post.  I
7  relaxed that order at one point to include radios on the
8  guard post.  But it was never a fact that they could have a
9  television on post.
10     Q   Why is it that you can have radios but not
11 televisions?
12     A   Radios, you can listen to and it doesn't distract
13 or take away from you performing your job, which is making
14 sure that you're checking personnel entering and exiting
15 associated with checking ID cards.
16         MS. BAY:  I'm going to show you a copy of what I've
17 marked as Authority Exhibit 2.
18                      [Whereupon, Authority Exhibit No. 2
19                      was marked for identification.]
20         BY MS. BAY:
21     Q   I'll ask you if you recognize that.
22     A   Yes, I do.
23     Q   What is this?
24     A   Is entitled the General Post Instruction.
25     Q   Who does this document apply to?

A    This is to the special police operations to the
protect services bureau, personnel assigned to protect the
services bureau, special police operations.

Q    Does this General Post Instruction contain any
prohibition with TVs?

ARBITRATOR CLARK:  Give me a second here.  Look at
item number 10.

THE WITNESS:  Yes, item number 10 states that you
will not have televisions, radios, cassette players, reading
materials, or similar items, other than authorized
instructions on your post at any time.

BY MS. BAY:

Q    As far as you know, how long has this been the rule
in regards to TVs on duty?

A    Actually, the television on post had been in place
long before I became the deputy chief of this bureau.  I
think this is from the inception.  The special police
operations was an ongoing operation, prior to the transit
police starting in 1976.  So I would suggest that it was
prior to 1976 that this took place.

MS. BAY:  We'd like to move that in as Authority
Exhibit 2.

[Whereupon, Authority Exhibit No. 2
was admitted into evidence.]

BY MS. BAY:

---

facilities, each of the guard posts.  Generally, what I do
is have the evening shift supervisor make sure that they take
and post these at each and every one of the guard posts.

MS. BAY:  We would like to move that in as
Authority Exhibit 3.

[Whereupon, Authority Exhibit No. 3
was admitted into evidence.]

MS. BAY:  I have one more document that I'd like
you to take a look at.  I'm marking this as Authority Exhibit
4.

[Whereupon, Authority Exhibit No. 4
was marked for identification.]

BY MS. BAY:

Q    Do you recognize that document?

A    Yes, I do.

Q    Did you draft that document?

A    Yes, I did.

Q    Would this document been distributed the same way?

A    Yes, this addresses the temporary implementation of
radios on post.  I'm now giving my concurrence that they can
have them on post, since there were no complaints.  The
reason I put it out was in case people were complaining that
they weren't doing their job, the radio was up loud or too
loud and interfering with their job duties.

I gave it a 30 day trial.  Then at the end of the

---

PAGE 30

Q    One other question about this document, how did
post employees know about these General Post Instructions?

A    When new employees come on board, the special
police officers are given a copy of the Post Instructions.
There are Post Instructions at each of the posts, and they
actually sign for a copy of the Post Instructions.  There
should be a signature listed in their personnel file or in
their operations file, indicating that they received a copy.

MS. BAY:  I'm going to show you another proposed
Authority Exhibit.

[Whereupon, Authority Exhibit No. 3
was marked for identification.]

BY MS. BAY:

Q    I'll ask you if you can identify this for us.

A    This is the modification to the Special Order
Number 10 that I wrote and distributed on August 10, 1998,
which allowed personnel to have a radio on post, and it gave
the specific following conditions, which is the volume must
be kept low; no radios at the Jackson Graham Lobby in B-1 and
B-2, Monday through Friday, between the hours of 0600 and
1800; absolutely no combination radio/televisions on post; no
boom boxes, nothing that would drawn attention to the post.

Q    How would this be distributed to special police
officers?

A    Copies of this were posted at each of the

---

PAGE 32

period, I implemented this, which made it final.  But it
still stipulates, no televisions.  Television was strictly
prohibited while on post.

MS. BAY:  We would like to put that in as Authority
Exhibit 4.

[Whereupon, Authority Exhibit No. 4
was admitted into evidence.]

MS. BAY:  I have one other document which I'm
marking as Authority Exhibit 5.

[Whereupon, Authority Exhibit No. 5
was marked for identification.]

BY MS. BAY:

Q    Do you recognize that document and can you tell me
what it is?

A    Yes, this is my writeup of the violations of post
instructions by Officer Dana Miller, while she was assigned
to the Shady Grove yard for having a television on post.  The
recommendation on this was termination for just cause.

Q    There are several attachments referenced in here.
Attachment number 1, would that be your mid-term evaluation?

A    Yes, it would.  Attachment number 1 was referring
to the letter I gave her, in reference to her mid-term
evaluation.

MS. BAY:  I'm going to show you what's been marked
as Authority Exhibit 6.

---

Court Reporting Services, Inc.

[Whereupon, Authority Exhibit No. 6
was marked for identification.]

BY MS. RAY:

Q    I'll ask you if this is also one of the referenced
attachments in your writeup?

A    This is Officer Miller's statement, which is
referred to as Attachment 2, acknowledging that she had a
TV/radio on post.

Q    You had this in your possession at the time you
dropped it at this office?

A    Yes, ma'am.

Q    Okay, there's an Attachment 3 also referenced here.
Is that the proposed instructions we talked about earlier?

A    Attachment 3 and Attachment 4 were referring to the
Interim Post Instructions that I modified allowing radios on
Post and Attachment 4 was the final.

MS. RAY:    That was introduced as Authority Exhibits
3 and 4.  We'd like to move Authority Exhibits 5 and 6 into
the record.

[Whereupon, Authority Exhibit Nos. 5
and 6 were admitted into evidence.

BY MS. RAY:

Q    Prior to drafting this document, did you interview
an individual by the name of Special Police Lieutenant
Franklin Johnson?

---

A    M

Q    So you're not sure how that signature got there?

A    No.

Q    According to her statement, the incident with the
TV in the booth at that post took place on January 21st, and
your recommendation for termination is dated May 3rd.  Can
you explain for us why it took four months for the
recommendation to be drafted?

A    There was an ongoing EEO investigation that was
referred to earlier, and I was requested to wait until the
EEO personnel finished interviewing all parties involved and
were able to get their investigation concluded.

Q    What impact, if any, did the allegations of sexual
harassment have on your decision that she should be
terminated from the TV incident?

A    None, whatsoever, because they were separate and
distinct items.  This was a violation of the post orders or
general orders.  She had already received full warning that
any type of disciplinary or violations within the 90 day
period would result in termination, and this was a result of
that.

Q    To your knowledge, when did the allegations of
sexual harassment occur, in relation to the TV incident?

A    The night of the 21st.

Q    But what's the time line?

---

A    Yes.

Q    Did you interview anyone else?

A    Well, I got a statement from Officer Miller.

Q    And she at no time denied the TV?

A    No.

Q    You recommended termination.  Was that your
decision?

A    It was my decision, based on the previous letter
that I had given her, indicating that as a result of her mid-
year evaluation, that she shouldn't have anything else come
up in her file or any additional disciplinary actions within
that 90 days.

Q    Did you meet with Ms. Miller to give her this
notice of your recommendation for termination?

A    No, I did not.

Q    Well, if you look at the second page, she signed
it.  You weren't in her presence when she signed that?

A    I think she was served her termination by --

Q    This is just a recommendation for termination?

A    I wrote the recommendation, but the termination was
acted upon by the new chief.

Q    Right, but going back to when you were still
involved, this was a recommendation for termination that she
apparently signed.  So my question to you is, did you meet
with her at some time about your decision?

---

A    Well, she was working.  I believe this was about
5:00 when Johnson came out to her post.  The allegations of
sexual harassment came, or I was notified of it, after --
well, I didn't find out about it until the next morning,
because there was a voice mail on my telephone from Officer
Deborah Miller indicating that the situation had occurred.  I
can't state exactly what she said verbatim, but she did
notify me that it has occurred the night before.

Q    What time was that phone call?

A    I believe it was 1:00 or 2:00 in the morning.

Q    Did you terminate other employees besides Ms.
Miller during your time as deputy chief?

A    Yes, ma'am.

Q    Was it your practice to give copies of termination
notices to the Union?

A    No, it was my opinion that it was always the
officer's job; or if they wanted the Union to know about it,
it was up to them, at that point.  That way, they can file a
grievance and take it to the Union, you know, for whatever
actions.  But I never sent a copy of the termination to the
Union.

MS. RAY:    That's all the questions I have for this
witness at this time.

CROSS EXAMINATION

BY MR. MAXWELL:

---

Court Reporting Services, Inc.

**PAGE 37**

```
 1      Q   Good afternoon, Mr.     .
 2      A   How you doing?
 3      Q   All right.  My name is Lindsey Maxwell.  I
 4  represent the Union.  I want to go through some cross
 5  examination questions with you.  Were you aware at any time
 6  whether or not Officer Miller had applied for another
 7  position as a bus driver?
 8      A   Yes.
 9      Q   Did she ever request that you write a letter of
10  recommendation for her regarding this position?
11      A   I believe there was an employment recommendation
12  thing that came down.  I don't think that she requested that
13  I fill it out.  The bus people sent it to me.
14      Q   Did you ever fill it out?
15      A   I believe I did.
16      Q   What types of comments did you place on that form?
17      A   I can't recall.  I'd have to look at it.
18      Q   Did you ever, at any time, state to anyone that you
19  were prepared to give Officer Miller her job back, but
20  because of the sexual harassment case, you couldn't?
21      A   I don't ever recall saying that, no.
22      Q   You stated earlier that you were asked to wait
23  until the EEO investigation was over before you acted on the
24  recommendation of termination.  Is that true?
25      A   Yes.
```

**PAGE 39**

```
 1  it anyway,      use it had been sitting for so long, or were
 2  you told, hey, we're done, go ahead and do whatever you're
 3  going to do?
 4      A   Well, I think one of the things that prompted me
 5  writing that, at that particular time, was I knew I was
 6  getting ready to retire.  So I was just trying to clear the
 7  plate and make sure I had everything cleared off.
 8      Q   So were you aware if the investigation was
 9  completed by EEO?
10      A   At that time, I believe so.
11      Q   Do you recall how you came to know that it was
12  completed?
13      A   I believe I saw a copy of the investigation.
14      Q   You also stated that you interviewed Frank Johnson
15  regarding this incident.
16      A   Actually, I don't think I did interview Frank
17  Johnson, because he had gotten an attorney.  Once he found
18  out that the EEO allegations were certain, his attorney told
19  him not to speak with anyone.
20      Q   Did you get any statement at all from Mr. Johnson
21  regarding this incident, written or otherwise?
22      A   There was a statement that Lieutenant Tisdale had
23  gotten from Lieutenant Johnson after all this had transpired
24  that night.  I believe he called Lieutenant Tisdale back in
25  the office.  He was still in the office at that time, and
```

**PAGE 38**

```
 1      Q   Who asked you to wait?
 2      A   I think it was Ms. Bailey.
 3      Q   Who is Ms. Bailey?  What is her position here?
 4      A   She's a supervisor in the Office of the EEO.
 5      Q   Would it have been normal procedure for an internal
 6  investigation to be put on hold until an EEO claim is
 7  resolved?
 8      A   In this particular instance, she asked me what I
 9  was going to do and I told her; recommendation, termination,
10  terminate.  She asked me to hold off until she finished her
11  investigation.
12      Q   When did she notify you that she was finished with
13  her investigation?
14      A   I'm note sure, sir.
15      Q   But you did issue a final letter of recommendation
16  for termination, right?
17      A   I did issue.  I wrote it, yes.
18      Q   What prompted you to go ahead and write that?
19      A   I was going to write it from the beginning.  I
20  mean, there was nothing that prompted me to write it.  There
21  was another mid-year evaluation if anything else came up
22  within the 90 days, and this was the result of it.
23      Q   I'm just trying to get a time frame, because you
24  said you were asked to wait and you waited.  Then at some
25  point you went ahead and wrote the letter.  Did you just do
```

**PAGE 40**

```
 1  then she had him come in and prepare a written statement.
 2      Q   Did you ever see a copy of that statement?
 3      A   I think I have.  Yes, I did, because I addressed it
 4  during the course of the investigation.  I said, in reference
 5  to his written statement.
 6      Q   Did that play any role in your decision to go
 7  forward with the termination of Officer Miller?
 8      A   Well, the going forward; no, not really, because it
 9  was a violation.
10      Q   I'm not going to ask you specifically, but just
11  generally.  Was any action taken against Officer Johnson?
12      A   After I left here, I believe Officer Johnson was
13  terminated.
14      Q   But you weren't involved in that?
15      A   I wasn't involved in any way.
16      Q   With regards to the mid-year evaluation, Authority
17  Exhibit 1, you state in here what her supervisors said on her
18  job performance.  Who specifically were those supervisors?
19      A   Captain Daryl Rice, and before he could submit it
20  to me, it had to go through Lieutenant Tisdale.
21      Q   Did it ever trouble you that Lieutenant Tisdale was
22  involved in decisions to recommendation termination, and that
23  Officer Miller had stated to you that she didn't think that
24  Lieutenant Tisdale liked her?
25      A   Would you rephrase that?
```

SHEET 2 PAGE 40

1   Q   Yes, that was not a good question; I'm sorry.
2   You're aware that Officer Miller had concerns about
3   Lieutenant Tisdale.  Is that correct?
4   A   Yes.
5   Q   When were you made aware that there were more
6   concerns there?
7   A   Well, I'm not exactly sure.  But it was just that
8   when disciplinary action was taken, then the supervisor
9   didn't like her.
10  Q   Did you give any credence at all to the fact that
11  Officer Miller believed that Officer Tisdale didn't like her,
12  and she would just take it as a normal day-to-day?
13  A   I'll let the record speak for itself, you know --
14  not the record, but the follow-up.  I mean, there were
15  numerous incidents where they had filed disciplinary actions
16  for Ms. Miller, and I overlook them and dismiss them.
17      I mean, it wasn't that I was, you know, looking to
18  get her, based on something that Lieutenant Tisdale said.  As
19  a matter of fact, I was the one that hired her, you know.  I
20  set up a special interview board to get her on board and hire
21  her.
22      So there was nothing on my behalf that would want
23  to see her get terminated, other than her not following the
24  rules and regulations.  She was given every chance and
25  opportunity in the book.

---

PAGE 42

1   Q   You said you've given out other disciplinary
2   actions in the past?
3   A   Yes.
4   Q   To other employees?
5   A   Yes.
6   Q   When an employee is on probation, have you ever
7   given them any leeway if they do violate the rules?  Have
8   they always been terminated?
9   A   It's called progressive discipline.  You know, the
10  first time you might get a letter of reprimand or a letter of
11  counseling, a letter of reprimand and a letter of suspension.
12  Then if it keeps mounting up, then it ends up in termination.
13      Each time that you get some type of discrimination,
14  the next incident may result in more severe disciplinary
15  action, up to and including termination.
16  Q   So it's true that probationary employees are given
17  the opportunity to go through progressive discipline?
18  A   Yes.
19  Q   So have there been other employees who have
20  violated their probationary status and not terminated?
21      MS. BAY:  I would need clarification on that
22  question.  What does violated probationary status mean?
23      MR. MAXWELL:  We've stated there are other
24  employees that are probationary, which we've already been
25  through.  He said they're given the opportunity to go through

---

1   progressive discipline.
2       So my next question is, if they've gone through
3   progressive discipline, whether at any other times when
4   somebody that's on probation violates the term of their
5   probation and are not terminated.
6       THE WITNESS:  You said "are terminated" first.  Now
7   you said "not terminated."
8       MR. MAXWELL:  Or are terminated.  What I'm trying
9   to get at is, are there times when an employee is on
10  probation, a probationary employee, and violate the terms of
11  their probation?  I think I asked that question earlier and
12  you said yes.  My next question is, well, if that's so, are
13  they always terminated?
14      MS. BAY:  Well, I think you can look at this
15  exhibit and see that that's not the case.
16      MR. MAXWELL:  Well, I'm not talking about her
17  specifically.  I'm talking about generally speaking;
18  probationary employees, generally speaking.
19      ARBITRATOR CLARK:  Wait a minute, the question is
20  unclear.  What precisely are you asking?  Are you asking, do
21  you personally, as a deputy chief, have any experience with
22  an employee during this one year period who was placed on
23  probation; and if they had subsequent violations, they would
24  be discharged, and you elected not to discharge the employee
25  under those circumstances, even though they did have

---

PAGE 44

1   subsequent violations?  Is that the question?
2       MR. MAXWELL:  That sounds great.
3       [Laughter.]
4       MS. BAY:  Did you get that?
5       THE WITNESS:  I got that.  There were other
6   employees who were disciplined.  For the most part, the
7   employees, once they got either a letter of reprimand or
8   suspension or whatever, most of the employees did not have
9   anything until after their one year period had been resolved.
10      I mean, for instance, with a person with a lot of
11  tardiness, you tell them, okay, another tardiness and you're
12  out of here, then for some reason or another, they find a
13  reason to come to work every day and have not been
14  terminated.  There have been other people that have been
15  terminated.  But for the most part, they do listen.
16      BY MR. MAXWELL:
17  Q   Have you ever extended somebody's probationary
18  period?
19      ARBITRATOR CLARK:  Again, wait a minute before you
20  answer.  I want that question to be very precise, so that
21  when the answer comes, we know what he's responding to.
22  Could you make the question more precise?  If you want me to,
23  I could restate it.
24      MR. MAXWELL:  No, no, I thought the question was
25  pretty clear.

**PAGE 45**

```
1              BY MR. MAXWELL:
2      Q    Have you ever extended anyone's probationary
3   period?
4      A    Yes, I have.
5          ARBITRATOR CLARK:  Wait a minute, I want the
6   response to be informing me.  Have you had any instance in
7   which a person, during the one year period, was given a
8   letter like the Grievant and told that if there are further
9   violations, you will be discharged; and you had an employee
10  who did commit further violations, and you extended the
11  period for them to remain a probationary employee and did not
12  fire them?
13         THE WITNESS:  No, I did not.
14         ARBITRATOR CLARK:  Okay, that's the precise
15  question.  If you want to try something else, please go
16  ahead.
17             BY MR. MAXWELL:
18     Q    So if I understand you correctly, there have been
19  times when you have extended somebody's probationary period,
20  and you didn't fire them?
21     A    Other than the reasons so stated by the Arbitrator?
22     Q    Yes.
23     A    Personnel that were on, went out for an illness for
24  an extended period of time, maybe an on-duty injury, and they
25  did not work a full year, the amount of time that they were
```

**PAGE 46**

```
1   out.
2      Q    Do you know who Officer Tameka Miller is?
3          MS. BAY:  Fuller.
4          MR. MAXWELL:  Fuller, I'm sorry.
5          BY MR. MAXWELL:
6      Q    Tameka Fuller.
7      A    You said, do I know who she is?
8      Q    Yes.
9      A    Yes.
10     Q    Was she a probationary employee?
11     A    Well, Tameka Miller was here twice, so I'm not sure
12  which incident you were referring to.
13     Q    This would be during the period of 2003.
14     A    Well, I mean, when she came on, she was a
15  probationary employee until one year was up, yes.
16     Q    To the best of your recollection, did she ever
17  violate her probationary period?
18         MS. BAY:  Objection, I don't understand what this
19  "violate probationary period" means.
20         MR. MAXWELL:  Well, if they are a probationary
21  employee and the violate the rules, at least understood the
22  CBA, if I understood you correctly earlier, that person can
23  be terminated for any reason.
24         So what I'm getting at is, we have other employees
25  who are in their probationary period, who violated their
```

**PAGE 47**

```
1   probationary period, and were not terminated.  So that's the
2   question I'm asking him.
3          MS. BAY:  I still don't know that you mean by
4   "violate probationary period."
5          MR. MAXWELL:  Well, if you're in your probationary
6   period and you violate the rules, have you not violated your
7   probationary period?  Maybe you don't like the way I'm
8   phrasing it.
9          MS. BAY:  Well, it's way too general.  I mean, as
10  you can see, we had numerous violations by Ms. Miller here,
11  and you're just trying to get him to agree that people were
12  not terminated during their probationary period in a very
13  broad sense.  It's too broad.
14         MR. MAXWELL:  Well, I'm trying to narrow it down by
15  identifying, so far --
16         MS. BAY:  Why don't we establish what rule
17  violations this person has committed, and then determination
18  what the outcome of her situation was.
19         MR. MAXWELL:  I have not gone to that yet.  I'm
20  still trying to get him to tell me whether or not she was a
21  probationary employee.
22         MS. BAY:  Everybody is a probationary employee,
23  right?
24             BY MR. MAXWELL:
25     Q    Was she ever written up, to the best of your
```

**PAGE 48**

```
1   recollection, for any violations of the rules during her
2   probationary period?
3      A    I believe so.
4      Q    Was she ever terminated?
5      A    I believe she left here on her own accord to get a
6   job or had another job.
7          MR. MAXWELL:  I don't have any further questions.
8          MS. BAY:  I would like a two minute break.
9          ARBITRATOR CLARK:  Sure.
10         [Recess.]
11         MS. BAY:  I have just a quick question on redirect.
12             REDIRECT EXAMINATION
13             BY MS. BAY:
14     Q    Mr. Hall, at any time during your interview with
15  Ms. Miller on January 16, when you gave her the mid-term
16  evaluation, did she raise any claims of being sexually
17  harassed by anybody at WMATA?
18     A    January 16th?
19     Q    During her mid-term.
20     A    No.
21         MS. BAY:  I don't have any further questions.
22         MR. MAXWELL:  I have a couple of further questions.
23             RECROSS EXAMINATION
24             BY MR. MAXWELL:
25     Q    When were you first notified of the sexual
```

Court Reporting Services, Inc.

PAGE 49

```
 1   "harassment claim regarding Officer Miller?
 2        A    The day after it happened.
 3        Q    On or about January 22nd, correct?
 4        A    It happened, I guess the incident took place on the
 5   21st.
 6        Q    I believe so.
 7        A    And they immediately went to the EEO and filed a
 8   claim on the 22nd, and I was notified that the complaint had
 9   been made.
10        Q    When were you notified of the allegations that
11   Officer Miller had violated the rules of the post?
12        A    The 22nd.
13        Q    Which came first?
14        A    My notification from my supervisor.
15        Q    Maybe you didn't understand the question. Which
16   came first?
17        A    That's like the chicken or the egg.
18        Q    Which came first, the sexual harassment claim or
19   the violation of the rule? Which one were you made aware of
20   first?
21        A    The violation of the rules.
22        Q    You said that came the next day.
23        A    On the 22nd.
24        Q    But you said the sexual harassment claim
25   information came to you --
```

PAGE 50

```
 1        A    On the 22nd, but there are time frames. The first
 2   thing in the morning, my supervisors briefed me on what goes
 3   on or takes place, or anything that comes up during the
 4   course of the day. So Lieutenant Tisdale briefed me the
 5   first thing when I got in the office that morning. My coming
 6   in the office was prior to the EEO office even opening up for
 7   anybody being able to file a complaint.
 8        Q    I understand. Maybe I misunderstood you earlier.
 9   I thought you said you received a phone call from Officer
10   Miller's mother regarding the sexual harassment closer to
11   midnight that day?
12        A    Okay, a complaint wasn't filed at that time.
13        Q    I understand.
14        A    She told me what had taken place or gave me a
15   synopsis to let me know or alert me that something had
16   happened that night.
17        Q    So Mrs. Miller's phone call came to you first, and
18   then later on that day, you heard about both incidents?
19        A    Let me just, for the record, clarify that, okay?
20   She left me a phone mail message at 12:00, 1:00, 2:00,
21   somewhere in that time frame in the evening. I did not hear
22   her phone mail until after I talked with Tisdale. Tisdale
23   called me first thing in the morning.
24             Then when I got here and listened to that, then I
25   got the phone mail message from Officer Miller.
```

PAGE 51

```
 1   Subsequently, later on that day, they went to the EEO office
 2   and made a complaint.
 3             MR. MAXWELL:  I have no further questions.
 4             MS. BAY:  Nor do I.
 5             [Witness excused.]
 6             MS. BAY:  The next witness will be Deputy Chief
 7   Jerry Lee. Let's go off the record for a moment.
 8             [Recess.]
 9   WHEREUPON
10                        JERRY LEE
11   a witness of lawful age, was called for examination by
12   counsel for the Authority and, having been first duly sworn,
13   was examined and testified as follows:
14                    DIRECT EXAMINATION
15        BY MS. BAY:
16        Q    State your full name for the record, please.
17        A    Jerry Lee.
18        Q    And where are you employed, Mr. Lee?
19        A    WMATA with the Metro transit police.
20        Q    How long have you been with WMATA?
21        A    With WMATA since 1980, with the transit police
22   since 1983.
23        Q    What positions have you held with the transit
24   police?
25        A    Originally, I was a probationary officer with the
```

PAGE 52

```
 1   transit police. I was promoted to sergeant. I was hired in
 2   1983 with the transit police. I was promoted to sergeant in
 3   1990. I acted as a patrol sergeant. In 1995, I was promoted
 4   to lieutenant in the capacity of research and planning.
 5        Q    In 1997, I was promoted to captain and I was
 6   assigned to the Internal Affairs Division. I'm not sure of
 7   the date, but subsequently three and a half years later, I
 8   was transferred to patrol, where I was a district commander.
 9   Then about a year and a half after that, I was transferred to
10   the criminal investigations division, where I was on the
11   detective branch bureau and bomb squad and traffic division.
12             Then, let's see, back in June, I was assigned to
13   the protective service bureau as the acting deputy chief.
14   Subsequently, 30 days later, I was named the deputy chief.
15   So I've been the deputy chief position since approximately
16   late June or early June. I mean, mid-June, I'm sorry.
17        Q    So you replaced Dan Hall as the deputy chief?
18        A    I did, indeed.
19        Q    And you were acting as of June 1, 2004?
20        A    Yes. The exact date, I can't tell you for sure.
21        Q    Tell us about your duties in that capacity?
22        A    Well, they are very similar to his. They're
23   exactly the same.
24        Q    Well, that makes sense.
25        A    I'm in charge of the special police operations,
```

Court Reporting Services, Inc.

PAGE 53

1  which consists officers, lieutenants, sergeants, a special
2  police captain and a sworn lieutenant, that are in charge.
3  They basically support and do security for the bus divisions,
4  rail divisions, and the building here. They are a 24 hour
5  operation.
6          Also, I oversee the revenue protection division,
7  which collects the money in various capacities. I'm also
8  over the revenue guards, who actually run the money to the
9  Treasury, the armored car and bus division. I'm also in
10 charge of the element security function that he also spoke
11 about. It's approximately 150 people.
12     Q    And encompassed in all those functions is issuing
13 discipline to the special police officers?
14     A    I review and approve of discipline. That's
15 correct.
16     Q    Did you have any involvement in the decision to
17 terminate probationary employee, Ms. Dana Miller?
18     A    I was involved.
19         MS. BAY: I'll show you a document and ask if you
20 recognize it. We'll mark it as Authority Exhibit 7.
21              [Whereupon, Authority Exhibit No. 7
22                    was marked for identification.]
23         THE WITNESS: I do recognize this document.
24         BY MS. BAY:
25     Q    Tell us what it is.

PAGE 55

1  that investigation.
2     Q    Let me show you what's been marked as Authority
3  Exhibit 1. Did you consider that document before you
4  terminated Ms. Miller?
5     A    This is one of the documents I did see in
6  conjunction with the investigation.
7     Q    And her investigation, I assume, contains a copy of
8  Authority Exhibit 5, Ms. Miller's statement?
9     A    I recognize this, and yes, it was a part of the
10 investigation. It was one of the attachments.
11        MS. BAY: We'd like to move Authority Exhibit 7
12 into the record.
13             [Whereupon, Authority Exhibit No. 7
14                  was admitted into evidence.]
15        BY MS. BAY:.
16     Q    So we know that according to Authority Exhibit 5,
17 Mr. Hall's recommendation for termination was dated May 3rd,
18 2004.
19     A    Yes.
20     Q    Authority Exhibit 7 is the termination notice dated
21 June 1st, 2004. Can you tell me why there was this month
22 delay in the recommendation and the actual action?
23     A    Well, I took over the position on June 1st. I had
24 some outstanding items in the office when I got into the
25 office. I was aware of several things to do with this

PAGE 54

1     A    It was a letter of termination from Chief Polly
2  Hansen to Special Police Officer Dana Miller. It's signed by
3  Dana Miller on 6/2/04.
4     Q    Did you draft this letter on behalf of the Chief?
5     A    It was drafted at my request to be presented to the
6  Chief.
7     Q    Did you issue this letter to Ms. Miller?
8     A    I did.
9     Q    So you had a meeting with her?
10    A    Yes, I did.
11    Q    What day was that?
12    A    That was June 2nd.
13    Q    Can I see that for a second, please? In the
14 letter, you come to the conclusion that she violated General
15 Post Instruction by having an unauthorized television on her
16 post. How did you come to that conclusion?
17    A    When I first came into the position, on my desk
18 were several investigations that needed to be processed. I
19 read the investigation that was written by Chief Hall. I
20 read the statements from all the principals and witnesses
21 involved in the incident.
22        From that, I found it to be complete. I found it
23 to be thorough, and I found it to be reasonable. Thus, I
24 approved that investigation. Well, I didn't approve it. He
25 had already written the investigation. But I concurred with

PAGE 56

1  investigation, one having to do with the civil rights
2  investigation that was ongoing at the time, that had recently
3  concluded.
4          I was also aware that Ms. Miller had filed a
5  criminal lawsuit against Lieutenant Johnson, charging him
6  with assault. I believe it was sexual assault, if I'm not
7  mistaken. So that, also in conjunction with the civil rights
8  coming in, was also one of the reasons why the investigation
9  had been held.
10         But I was aware at the time that the burden of
11 proof was considerably different as it related to us taking
12 action at that point. The burden of proof as it related to
13 the criminal action was beyond a reasonable doubt. In this
14 case, it was a preponderance of the evidence at that point.
15         I had read the investigation. I had read the
16 attachment. I had read the statements, and then some of my
17 training from criminal investigation as related to statement
18 analysis, deception detection and those issues there. I was
19 convinced at that time that I had enough information to go
20 ahead with the action.
21         Also, in conjunction, when I shared the information
22 with the Chief, all the documents, and we had had
23 conversation on it because of the termination. I do not
24 write terminations. All the terminations ultimately come
25 with the Chief, and the Chief was convinced at that point.

1 So she signed off on the doc■■■ at that point, after I had
2 briefed myself and her that this was the appropriate thing to
3 do.
4     Q   The internal division for EEO at WMATA is called
5 the civil rights office. Is that correct?
6     A   Yes, I believe that's correct.
7     Q   Had that investigation been concluded before you
8 terminated her?
9     A   I believe it had been completed at that time.
10     Q   Were you familiar with the results?
11     A   I was familiar with the results.
12     Q   What were those results?
13     A   My understanding is that they found cause, to some
14 degree.
15     Q   Cause on whom?
16     A   For Lieutenant Johnson, as it related to what his
17 actions were, his actions he took after he had found Officer
18 Miller on post with the TV.
19     Q   Explain that for us.
20     A   Well, my understand, in reading all the information
21 there, is that Johnson came to the post to deliver some mouse
22 traps, I understand. When he got there is when he observed
23 the violation.
24     In observing the violation, she raised it to him
25 that she needed her job. My understanding of that was, she

1 understood that she was on probation, she had been put on
2 notice, and that another violation, she would be terminated
3 for. So thus, she made a statement to him that she needed
4 her job at that point.
5     What I interpreted from that information is that
6 there are other violations that she had already had. This
7 violation, at this point, after being put on notice, five
8 days prior to that, and this violation coming very
9 contemporaneous with the other notice at that time, I held
10 that to be a very significant piece of evidence, as to my
11 interpreting of what's going on with this investigation.
12     Q   Okay, there's the TV in her post that was seen.
13     A   Yes.
14     Q   What is your understanding in terms of the time
15 line as to when the allegations of sexual harassment
16 occurred?
17     A   Well, my understanding, in retrospect, in going
18 back in and looking at some of the notes from the Internal
19 Affairs investigation, because this originally started out as
20 an Internal Affairs investigation with Captain Hileman, that
21 this all happened, and there allegations going on that next
22 morning on the 22nd. She was brought in at that time and
23 everyone gave statements to Internal Affairs at that time.
24     Now, when she gave the statement, I had found out
25 later on that she had made an allegation about the criminal

1 sexual ass■■■, and I also understand that she did not say
2 anything at that time about one of the allegations that
3 subsequently came up, that Lieutenant Johnson touched her
4 breast when she was in his house.
5     Q   So when did all this occur?
6     A   Which part?
7     Q   These allegations about what happened with her and
8 Johnson.
9     A   Well, there were the allegations early on about
10 coming to the house and the whole issue associated with,
11 someone won't turn in this piece of paper.
12     Q   What piece of paper?
13     A   The statement that she wrote. This is all around
14 the statement that she wrote, where she basically said up
15 front, I had the TV on my post. It was a violation. I think
16 she even makes a statement in there about needing her job or
17 something about her job at that point. My interpretation at
18 that point is that she was still aware of being put on notice
19 on the 16th.
20     Q   Slow down for a second. Is the statement you're
21 referring to?
22     A   Yes, because it reads, "Lieutenant Johnson came to
23 my booth at Shady Grove and saw that I had a TV/radio in my
24 booth. He explained to me that it is now allowed in the
25 booth, and he needed a statement. I was not using or

1 watching the TV at the time." She said, "Seriously, I do
2 need my job. I was not watching the TV." So by saying, "I
3 need my job," it suggested to me that she was aware of the
4 impending discipline.
5     Q   So is it your understanding she completes this
6 statement admitting she has the TV, and then something later
7 occurs that evening when she tries to get the statement back
8 from Johnson. Is that accurate?
9     A   That is undisputed that that is the time line.
10 That happened. The event happened. The statement happened,
11 then something else happened.
12     Q   Okay, we were talking about the findings of the
13 civil rights complaint. I don't think we ever finished that.
14     A   Maybe not.
15     Q   What were the findings?
16     A   I believe they found cause that there was sexual
17 harassment on the part of Lieutenant Johnson. It also had
18 recommendations in there, and there was some statement in the
19 investigation also, about the actions of Ms. Miller, as it
20 related to how this thing unwinds as far as going to the
21 house and all these other kind of issues. That was my
22 interpretation of the way I believe it was written.
23     Q   Whose house did she go to?
24     A   When she went to Lieutenant Johnson's house later
25 that night.

SHEET 16 PAGE 61

1  Q  Okay.

2  A  Now there was a recommendation by civil rights that
3  Lieutenant Johnson be demoted, and that's what was sent back
4  to us in that original investigation from civil rights.

5  Now when we looked at that recommendation and when
6  I looked at that, and subsequently, I believe I met with
7  Lieutenant Johnson within a week of this meeting I had with
8  Ms. Miller, I found that recommendation not to be appropriate
9  and useful for me at this point.

10  Because I thought that violation, his response, and
11  some of his answers to his responses and his non-responses
12  and inability to answer certain questions to it were not
13  appropriate for us.  So we felt demotion from lieutenant to
14  sergeant was inappropriate, from sergeant to officer was
15  inappropriate.  We thought termination would be the most
16  appropriate stand.

17  One of the same reasons why we did that, I have a
18  work force in the special police that it is a majority of
19  women, probably 80 percent women.  If I left him in the
20  supervisory position by demoting him to sergeant, I knew he
21  would still have direct contact with them and I thought that
22  would be inappropriate.  If I left him on the job as an
23  officer at that point, there's still a possibility of him
24  working on similar posts.  I thought that would be
25  inappropriate.

PAGE 62

1  I thought it was very serious that someone would
2  make an allegation of sexual harassment, and I thought it was
3  important that we send a message out that we will not
4  tolerate that.  So we terminated him.

5  Q  Has anything happened since his termination?

6  A  Well, Lieutenant Johnson was a non-rep employee, so
7  he has a different avenue.

8  Q  What's a non-rep; non-represented?

9  A  He's not represented by unions at all.  So he's
10  just like myself, basically.  He's under the same policies
11  and structures as myself, and in those policies and
12  instructions, which is outside the transit police rules and
13  regulations, it's WMATA rules.

14  Basically, he availed himself of the grievance
15  procedure, and he wrote a letter to the Assistant General
16  Manager, requesting that his case be heard again.  So he
17  wrote a letter to Mr. Scott.

18  Q  Who is Mr. Scott?

19  A  Mr. Scott is the AGM WDDP.

20  Q  Workforce Diversity and Development.

21  A  Thank you, and when he wrote that letter, Mr. Scott
22  took the letter, in compliance with the policies, and sent it
23  to another AGM, someone who is completely devoid of the
24  situation, which was Mr. Rico, who is charge of buses, and he
25  conducted an investigation.

PAGE 63

1  Q  We reviewed -- I lost my train of thought.  I'm
2  sorry.

3  A  The investigation, Rico?

4  Q  Yes.

5  A  After Rico got the investigation, he came down and
6  he interviewed me.  He interviewed me on multiple occasions.
7  Then I believe there were several meetings where talked about
8  what Johnson did, how we felt about it, and if we felt he
9  could be back in the work place.  We emphatically said no;
10  under no circumstances would we bring him back.  We did not
11  feel it was appropriate to bring him back.

12  Although Lieutenant Johnson was an 11 year employee
13  and was almost an exemplary employee, he basically had two
14  lead supervisors at that time.  That put us in the hardship
15  that we were in at the time.  At that time, I had two
16  lieutenants.  One, I was in the process of demoting, and then
17  the other problem I had was, if he wasn't there, I would have
18  no lieutenants.

19  We felt it was so important that we needed to
20  separate him from our department.  Because even though he was
21  our best employee, because of what had happened, that was a
22  decision that we made.  It was very much a hardship on us,
23  because we did make that decision.

24  Q  You said he was an exemplary employee.  Did he have
25  any discipline?

PAGE 64

1  A  Believe me, I came in later on in the process.  I
2  am not aware of any.  I met the gentleman one week after I
3  was there, like I met Ms. Miller the second day I was there.
4  So I was trying to be as objective as possible, keeping the
5  job in perspective, and the commitment to the job was very
6  important.  So I wanted to make sure that we were fair to the
7  job and fair to the people.

8  Q  Okay, so what was the conclusion of the independent
9  evaluation done by Rico?

10  A  Rico, basically, he did not challenge any of our
11  conclusions.  He did not challenge any of the things we did.
12  It was a little disjointed at the end, where at the end, he
13  did make a recommendation back to Mr. Scott that Mr. Johnson
14  be given the opportunity to resign or to give him the
15  opportunity to come back and take a job as an officer.

16  Q  Would that be a demotion?

17  A  That would be a demotion two times, something we
18  have never done.  We've demoted one rank in the past, and
19  we've only done one demotion, that I'm aware of, in the
20  history that I've been in the police department, in the
21  police department and the special police.  I've done one
22  demotion of one grade.  I've never done a two grade demotion.

23  Ultimately, that's what we did.  Well, no, it was
24  even worse than that.  Not only was it a two grade demotion,
25  it was also to hire him back as a new employee, which would

SHEET 17  PAGE 65

1  put him down at the bottom of seniority list, give him
2  the worst possible selection of jobs, and basically start him
3  as a grunt as it relates to how they speak in the Army.
   Q  And I would imagine that was no back pay?
   A  No back pay was associated with that. There was no
6  indication that we did anything wrong in our administration
7  of that.
8       I would like to bring to your attention, also, we
9  do a lot of things in law enforcement. We try to teach our
10 special police similar to the way we treat our sworn police
11 officers. From an investigative perspective, we did
12 everything we could possibly do to inquire as to an
13 explanation for what happened.
14      In both cases, we are very convinced that this time
15 that we do know for a fact that there was a violation on that
16 post.
17 Q  There was a violation?
18 A  A violation by Ms. Miller.
19 Q  With the TV.
20 A  With the TV, because it is not in dispute at this
21 point. As it relates to the sexual harassment portion of it,
22 my position was on that, I'm not sure who propositioned who,
23 or if there was a proposition in any case.
24      But I am convinced that the response of Johnson was
25 inappropriate at that point, and I wanted to take an action

PAGE 66

   to ensure that our employees don't have to deal with that.
   It was not pervasive. It was not ongoing. When we found out
3  about it, we took action as soon as we could.
4       Now the reason why we didn't do it from January to
5  May, like I said, it was a civil rights violation. There was
6  a criminal investigation ongoing, and then subsequently,
7  there was an EEOC investigation that was ongoing. It is not
8  in our best interests some time to circumvent some of these
9  things and still have an outcome that is still positive and
10 is supportable.
11 Q  But since you did weigh it, whatever the outcome
12 was going to be in the civil rights claim, was that going to
13 factor into your decision on whether or not to terminate Ms.
14 Miller?
15 A  The outcome in the civil rights case, we're looking
16 at two different cases. The outcome in the civil rights was
17 looking at a sexual harassment complaint that happened after
18 our rules violation. Our rules violations were crystal clear
19 the day we came to work on the 22nd.
20 Q  Is Mr. Johnson back to work?
21 A  Mr. Johnson has not taken us up on the offer to
22 come back to work at this point. So he's not on the ranks at
23 this point.
24 Q  You met with Ms. Miller about her termination.
   A  Yes.

PAGE 67

1  Q  And you gave her the notice?
2  A  Well, actually, I read the investigation to Ms.
3  Miller, verbatim.
4  Q  What investigation? The termination letter?
5  A  No, actually, I read the investigation by Deputy
6  Chief Hall to Ms. Miller.
7  Q  The recommendation for termination?
8  A  Yes.
9  Q  Okay.
10 A  And I read the termination letter. In both cases,
11 at the end of the investigation, I read the letter to her. I
12 asked her, did she understand.
13      I asked her, was there anything not true, not
14 factual, or was there any implication in there that's not
15 true, or was there anything that she wanted to say about the
16 conclusion of the investigation. She answered, no. She
17 asked me, was she fired at that time, and I informed her she
18 was. That's when I went and read the termination letter to
19 her that had been presented and signed by the Chief.
20 Q  And she didn't have any comments except to ask you
21 if she was fired?
22 A  She did ask me if she was fired. Those are the
23 only comments that I can recall. In the room at that time, I
24 believe, was Lieutenant Tisdale and one of the special
25 police, I believe, Captain Rice was present, also.

PAGE 68

1  Generally, I made copies for her of the investigation. I
2  made copies of the termination letter at that point.
3  Q  Did she, at any time during that meeting, ask for
4  Union representation?
5  A  No.
6  Q  As deputy chief, have you terminated other
7  employees besides Ms. Miller, or have you disciplined other
8  employees?
9  A  I have disciplined and I have gone through the
10 action of termination. The official termination is by the
11 Chief. But I have, indeed, notified people of termination in
12 the six months that I've been here.
13 Q  Is it your practice in those situations to cc the
14 Union on the discipline notice?
15 A  No.
16 Q  Or just to give a copy of the discipline notice to
17 the Union?
18 A  Well, I give a copy to the member, and the member
19 has the option, at that point, to do what they want to. They
20 can take it to the Union. It's their copy.
21      MS. BAY: I want to show you what's marked, I
22 think, Authority Exhibit 8.
23              (Whereupon, Authority Exhibit No. 8
24              was marked for identification.)
25      BY MS. BAY:

## SHEET 18   PAGE 69

```
 1    Q    I'd ask you if you recognize this document?
 2    A    I do.
 3    Q    Tell us about it.
      A    It's a letter from the Teamsters 639 dated June 9,
 5  2004.  It's to acting deputy chief, J.K. Lee.  It's from
 6  Diana Paison, business representative.
 7    Q    Did you receive this from Ms. Paison?
 8    A    It was addressed to the Chief, also.  I did receive
 9  it.
10    Q    Did you consider this to be a grievance on behalf
11  of Ms. Miller?
12    A    No.
13    Q    Can you tell us why?
14    A    Well, according to the Union contract, they are
15  required to file a grievance; and according to one of the
16  modification memos that we've put together, saying that they
17  not only no longer need a shop steward working the file
18  agreements.  It's just that they fill out the form.  They
19  basically state what the violation is, state the article
20  violation, and ask for a remedy.
21         Every time since I've been in there and every time
22  when I was in Internal Affairs, when I actually handled all
23  the grievances for three and-a-half years, they always came
24  in on the letterhead and a grievance form from the Union.  So
25  I did not recognize this as a grievance, because it didn't
```

## PAGE 70

```
      meet any of the criteria, nor was it reasonable and customary
 2  the way we normally do it.
 3    Q    Take a look at Joint Exhibit 3.  Is that the form
 4  that you're accustomed to seeing?
 5    A    Yes, this the form that we generally see the Union
 6  grievances come in on.  It's called a Grievance Reporting
 7  Form, and it's usually signed at the bottom, a lot of times
 8  by the shop steward, but in this case, it's not even
 9  necessary.  It need only be signed by the member at this
10  time.
11         MS. BAY:  Okay, we'd like to move Authority Exhibit
12  8 into the record.
13              [Whereupon, Authority Exhibit No. 8
14              was admitted into evidence.]
15         THE WITNESS:  Well, I didn't tell you what it said.
16  Do you want to put that on the record?
17         BY MS. BAY:
18    Q    Well, you can say it.
19    A    It was a one line letter that basically says, "Dear
20  Ms. Hansen," who is the Chief, "The Union does not agree with
21  the termination of Special Police Dana Miller."
22    Q    So no where on the face of this document does it
23  even say "grievance."
24    A    No.
      Q    At any time during your meeting with Ms. Miller on
```

## PAGE 71

```
 1  June 2nd, did she raise allegations of sexual harassment?
 2    A    I don't recall.  I don't recall her every raising
 3  allegations.
 4         MS. BAY:  I don't have anything else at this time.
 5              CROSS EXAMINATION
 6         BY MR. MAXWELL:
 7    Q    Having a TV on your post, is that considered a
 8  serious violation of the rules?
 9    A    I consider all the violations to be serious.  Can
10  you clarify what you mean by "serious"?  We wouldn't have a
11  rule for it, if it wasn't.
12    Q    Sleep is a violation, correct, sleeping on post?
13    A    Yes, it is.
14    Q    Is sleeping considered a serious violation?
15    A    They're all serious violations.  We consider them
16  all to be serious.  We enforce the rules.
17    Q    Let me step back for a minute.  Is it true that
18  some violations would warrant termination right up front?
19    A    There may be some violations that we could
20  terminate immediately on, right.
21    Q    Can you just give me one example of a violation
22  like that?
23    A    Do you want me to speculate?
24    Q    I'm just asking your opinion of what would be a
25  violation?
```

## PAGE 72

```
 1    A    Now, see, it is determined on, what are the facts
 2  of the case, what the violation would be, are there
 3  mitigating circumstances, was there a reason to do something
 4  different, other than follow the rules at that time.  Can
 5  they articulate a reason for the actions they take.
 6         So to arbitrarily say, is there a violation that I
 7  would terminate for right away, it would be improper for me
 8  to say that.  I couldn't say that, because there's just so
 9  many factors involved in it.
10    Q    But you answered yes to the question that there
11  would be some violations.
12    A    There is a condition why I would understand that
13  there would be one violation where we could probably go
14  directly to termination, yes.
15    Q    Let me call your attention to, I think this was
16  marked as Authority Exhibit 2.
17         MS. BAY:  Hold on a second.
18         BY MR. MAXWELL:
19    Q    Let me call your attention to Item 21.
20    A    Sleeping on duty is one of the most serious
21  offenses; yes, I see it.
22    Q    Why is that specified as the most serious offense?
23    A    Well, I really couldn't say.  I wasn't the author
24  of the document.
25    Q    But you're charged with enforcing this document,
```

SHEET 19   PAGE 73

PAGE 73

1   right?
2        A    I said I don't know why it was written this way.
3   Was that your question?
4        Q    No, no, my question was, you're charged with
5   enforcing this document, correct?  That's part of your job
6   responsibilities, to enforce General Post Instructions?
7        A    No, the sergeant enforces Post Instructions.  The
8   lieutenants oversee it.  I review the Bureau.  I'm over here
9   at the Bureau.
10       Q    But the ultimate decision on whether or not to
11  impose any kind of discipline falls on you?
12       A    I review all discipline prior to implementation.
13       Q    And the document identifies this, not only in Item
14  21, but it identifies other items between 18 and 24.
15       A    Yes.
16       Q    And it identifies specific offenses, correct?
17       A    Yes, they do.
18       Q    These are specified for a reason.  Is it your
19  testimony that you don't know why these are specified?
20       MS. BAY:  Specified as what?
21       BY MR. MAXWELL:
22       Q    Well, they are specified.  Being late to work is
23  not specified, but we do specify --
24       A    When you say "specified," specified as what?
25       Q    As it's in this document.  It is in this document

PAGE 74

1   that these are violations:  sleeping on duty, use of
2   intoxicants or narcotics.
3        A    Yes.
4        MS. BAY:  Having a television is specified.
5        BY MR. MAXWELL:
6        Q    Insubordination.
7        A    Yes, they are.
8        Q    So my question, again --
9        A    I'm sorry, I didn't hear you pose it the first
10  time.
11       Q    My question is, why isn't having a TV listed as one
12  of the most serious offenses?
13       A    Again, I'm telling you, I'm not the author of this
14  document.
15       MS. BAY:  He did not write these Post Instructions.
16  He can't speak to that.
17       MR. MAXWELL:  No, he didn't write them, but he's
18  charged with enforcing them.
19       MS. BAY:  He can't speak to the language that was
20  used in the document.
21       MR. MAXWELL:  But he has to enforce it; so if he
22  doesn't know the language, how can he?
23       THE WITNESS:  I know the language.  You're asking
24  me why was it not specified when the document was written 20
25  years ago.  Is that what you're asking me?

PAGE 75

1        BY MR. MAXWELL:
2        Q    What I'm asking you is, sleeping on duty is one of
3   the most serious offenses.  This is my original question.
4   Why is it one of the most serious offenses?
5        MS. BAY:  Sleeping on duty is not the offense at
6   issue here.
7        ARBITRATOR CLARK:  Is there an objection?
8        MS. BAY:  Yes, it is an objection.
9        ARBITRATOR CLARK:  Objection overruled; go ahead.
10       THE WITNESS:  I just want to clarify the question,
11  if I may.  Are you trying to ask me to justify why sleeping
12  is one of the most serious, or why the other ones weren't
13  considered to be most serious?  I'm not sure which one you're
14  asking me.
15       BY MR. MAXWELL:
16       Q    It says here, General Post Instructions, item 21,
17  "Sleeping on duty is one of the most serious offenses an
18  officer can commit."
19       A    Yes.
20       Q    Then in your estimation, why is it one of the most
21  serious offenses?
22       A    Well, I can speculate why this would be in there,
23  from a security perspective, even if I had nothing to do with
24  this organization.  We hire the people to be on post, to
25  engage their senses, their eyes, their ears, their smelling,

PAGE 76

1   their touch, to be able to call in problems going on.  Once
2   the person goes to sleep, they are no longer able to engage
3   any of their senses or do any of the things we asked them to
4   do.
5        Basically, it's a gross dereliction of duty if you
6   go to sleep on post or on any job.  I would assume if you
7   were to sleep right now, your employer would have a problem
8   with that.
9        Q    Would you consider having a TV on post a gross
10  dereliction of duty?
11       A    It would depend.  Can I finish my answer?
12       MS. BAY:  Yes, absolutely.
13       THE WITNESS:  It would depend if it's a gross
14  dereliction of duty, if it's willful or intentional, and
15  you've been put on notice time and time again, and what your
16  working conditions have been, what your work record has been
17  in the past, and it shows what your prior performance and
18  what your future performance could be.
19       At that point, I would get to the point where every
20  one of my officers I put on the street, I have to trust them
21  to do the right thing.  After I notified them and tell them
22  repeatedly to do certain things, and I no longer can trust
23  them, at this point, if that's what they display to me, I
24  think it would be a gross dereliction of duty.  It would be
25  not difficult to interpret that as a gross dereliction of

SHEET 20  PAGE 77

1  duty at that point. But that's just the way I look at it.
2      Q   When did you become aware of Authority Exhibit 8,
3  which is the letter from Ms. Faison to Hansen? That letter
4  did not come to you directly, did it?
5      A   I believe it did. Generally, correspondence from
6  the Union having to do with the special police, the
7  secretaries will forward it directly to me. My
8  understanding, and I can't say for sure, but it probably was
9  on June 9th or right on that date when it's dated, or maybe
10  the day after, in some cases.
11      Most of the time, it's the day after the date on
12  it, because of the time it takes to get here, if it's an
13  actual document that's faxed. Sometimes they'll fax them and
14  sometimes they'll mail them. Sometimes they'll do both. But
15  I did not sign the document as to when it touched my hand.
16      Q   You testified earlier that that document was not a
17  grievance.
18      A   No, it's not a grievance.
19      Q   Why is it not a grievance?
20      MS. BAY: That's been asked and answered already.
21      THE WITNESS: Do you want me to answer it again?
22      BY MR. MAXWELL:
23      Q   Yes.
24      A   Okay, I did not view that document as a grievance
25  because of our customary interaction between the Union. We

PAGE 78

2  used a grievance form.
2      It was not in compliance with the Union contract.
3  It did not state a violation. It did not state an Article.
4  It did not ask for a remedy. It did none of those things.
5  It was not specific in a point that we could respond to it,
6  because it did not address any of the issues that come under
7  the Collective Bargaining Agreement.
8      Q   To the best of your knowledge, is there anywhere in
9  the contract that states that a grievance must be put on that
10  grievance form that you identified earlier? I think it was
11  Joint Exhibit 3.
12      A   I would like to see the contract.
13      MR. MAXWELL: Grievances is page 5.
14      MS. BAY: And what was the question?
15      MR. MAXWELL: I'm going to withdraw the question.
16      BY MR. MAXWELL:
17      Q   Let me call your attention to Article 5 of the
18  contract, which is the grievance procedure. Is there
19  anywhere in Article 5 that states that a grievance must be
20  put on that specific form?
21      A   I don't see it in the contract, but there is a
22  memorandum that was forwarded to the members on July 30,
23  2001.
24      MS. BAY: He's referring to Joint Exhibit 2.
      THE WITNESS: Yes, Joint Exhibit 2, where it

PAGE 79

1  basically says the Grievant employee will complete a
2  Teamsters Local 246 Grievance Form in its entirety within the
3  specified seven days after the employee is notified of the
4  impeding action giving rise to the grievance.
5      Now this was basically drawn up in agreements with
6  Mr. Terrance Edwards, who was the business agent of the
7  Teamsters at that time, and he sat down and came up with this
8  understanding with Former Chief McDivitt, because there was a
9  problem, and a reasonable problem I understand, because the
10  members couldn't get with their shop steward in order to file
11  the grievance that was codified in the Union contract.
12      That understanding with the Union, with our prior
13  Chief, basically relaxed the Union contract and said, this is
14  the way it will be done. This the way it always had been
15  done, and this is what we recognize as usual and customary.
16      BY MR. MAXWELL:
17      Q   Under Article 5, a grievance is defined as a
18  dispute between the Authority and the Union. Would you view
19  that letter as a dispute between the Authority and the Union?
20  The letter I'm talking about is Exhibit 8.
21      A   No, I wouldn't, since this memorandum exists. We
22  looked at it as a living document, and it grew out to this
23  memorandum.
24      Q   Were you aware that Officer Miller had applied for
25  another position at Metro?

PAGE 80

1      A   At what time? I know now.
2      Q   Prior to today.
3      A   I did know prior to today, yes.
4      Q   Were you ever asked to provide any recommendation
5  for her employment for that position that she was applying
6  for?
7      A   No, I was not.
8      Q   Did you, at any time, state that you were willing
9  to give Officer Miller her job back, but because of the
10  sexual harassment case pending, you couldn't do that?
11      A   State to who?
12      Q   To anyone.
13      A   I never said it to anyone. I never even thought
14  it.
15      MR. MAXWELL: All right, I have no further
16  questions.
17      MS. BAY: I have just one quick question.
18      REDIRECT EXAMINATION
19      BY MS. BAY:
20      Q   Have you ever entertained a grievance that came on
21  a letterhead such as Authority Exhibit 8?
22      A   Never.
23      Q   As a grievance for handling?
24      A   Never.
25      MS. BAY: I don't have any other questions, and we

SHEET 21   PAGE 81

1   would rest, subject to rebuttal.
2            MR. MAXWELL:  There's no recross.
3            MS. BAY:  We're resting, except for rebuttal.
4            MR. MAXWELL:  Can we take a short break?
5            MS. BAY:  Yes, I'd like that.
6            ARBITRATOR CLARK:  You've got five minutes.
7            [Recess.]
8            ARBITRATOR CLARK:  We can continue.  Back on the
9   record.
10           MR. MAXWELL:  Due to the time constraints, we're
11  going to call this a little bit out of order.  I'm going to
12  call Mrs. Miller first, because she has to leave.
13  WHEREUPON
14                    DEBORAH MILLER
15  a witness of lawful age, was called for examination by
16  counsel for the Authority and, having been first duly sworn,
17  was examined and testified as follows:
18                   DIRECT EXAMINATION
19  BY MS. MAXWELL:
20      Q    Mrs. Miller, will you please state your full name
21  for the record?
22      A    Deborah Lynn Acres Miller.
23      Q    Are you currently employed?
24      A    No, I'm retired.
25      Q    Retired from where?

PAGE 82

1       A    Metro transit police.
2       Q    How long were you an employee of Metro?
3       A    Twenty-six years, ten months.
4       Q    In what capacity did you serve here at Metro?
5       A    I was an officer with the revenue fair collection
6   division.
7       Q    And were you there for the entire time of your
8   employment?
9       A    For twenty-four years.
10      Q    What else did you do?
11      A    I was an officer in patrol.
12      Q    Did you receive a phone call from your daughter on
13  the evening of January 21st, 2004?
14      A    Yes, I did.
15      Q    What was the nature of that phone call?
16      A    She called because she didn't know what to do,
17  because she was propositioned by Lieutenant Johnson at the
18  Shady Grove station.
19      Q    Did she give you any specifics about that
20  proposition?
21      A    Yes.
22      Q    What did she say?
23      A    She said that he wanted her to sleep with him in
24  lieu of writing her up.
25      Q    Did she tell you why she was going to be written

PAGE 83

1   up?
2       A    For having a TV/radio combination in the booth.
3       Q    Did she tell you anything else during that phone
4   conversation?
5       A    She basically said that she was going to have to
6   sleep with him to keep from losing her job.
7       Q    What did you tell her to do?
8       A    I waited.  I told her, "You can't sleep with him."
9   I said, "I have to get some answers.  This doesn't make
10  sense."  It didn't make sense.
11      Q    What happened after that point?
12      A    So then I rode with her.  I made a call, but it was
13  too late in the evening to get answers.
14      Q    Who did you make a call to?
15      A    I called Chief Hall at the time, but it was too
16  late.
17      Q    Why do you say it was too late?
18      A    Because I got a voice mail.
19      Q    Did you leave a message?
20      A    I didn't leave a message.
21      Q    You did not leave a message?
22      A    No.
23      Q    What happened next?
24      A    Then I called my cousin.
25      Q    Who is your cousin?

PAGE 84

1       A    He is a retired Metropolitan officer or captain.
2       Q    What's his name?.
3       A    Joseph Acres.
4       Q    What did Mr. Acres tell you to do?
5       A    He said that's a very touchy, sticky, dirty
6   situation, and you're going to have to be very, very careful.
7   He asked me if I had a camcorder, and I said, no.
8            He said to take pictures, to ride with her, and
9   just make sure and take notes of everything that happens, and
10  make sure you get pictures of everything; and once she walks
11  in the door, you ring the bell, and you let me Mr. Johnson
12  know that he's in violation of EEO and Metro, in reference to
13  what he was trying to do.
14      Q    Did Mr. Acres tell you anything else during that
15  phone call?
16      A    Well, he offered to go, but because he lived in
17  Bowie and it was time sensitive, I said I would just do it.
18      Q    So what happened next?
19      A    I met my daughter and my grandson at the Kaiser on
20  Branch Avenue.
21      Q    Did she ask you to meet her there?
22      A    I told her I would meet her there.  We agreed to
23  meet there.
24      Q    What happened when you met her?
25      A    I got in the car with her in the back seat and rode

SHEET 34    PAGE 133

```
 1        Q   So you're represent● that this is a Step 3
 2   grievance, right?
 3        A   Yes.
 4        Q   Dated June 9th, 2004?
 5        A   Yes.
 6        Q   This is your Step 3 grievance. What's this
 7   document?
 8        A   That is the follow-up on the Step 3 grievance.
 9        Q   What's the purpose of a follow-up?
10        A   Because I'm protesting her termination, okay.
11        ARBITRATOR CLARK:  Excuse me, could you identify
12   what document that is?
13        MS. BAY:  Joint Exhibit Number 3.
14        ARBITRATOR CLARK:  Joint Exhibit Number 3
15   BY MS. BAY:
16        Q   You filed this on June 9th.
17        A   Yes.
18        MS. BAY:  Let's just give the Arbitrator a minute
19   to find his document.
20        ARBITRATOR CLARK:  Okay, I've got Joint Exhibit
21   Number 3.
22   BY MS. BAY:
23        Q   So you filed what you claim to be the Step 3
24   grievance on June 9. My question to the witness then is,
25   what is the purpose of the June 28 grievance form, which I
```

PAGE 134

```
 1   believe is actually signed by you at the bottom? Is that
 2   your signature?
 3        A   Yes, it is.
 4        Q   What's the purpose of this?
 5        A   This is giving the statement on the reason why she
 6   believed that she was terminated.
 7        Q   Why was that not contained in your June 9th letter?
 8        A   Because obviously, her termination paperwork, and
 9   this is the follow-up.
10        Q   She didn't tell you why she was terminated, because
11   you saw this June 9th letter?
12        A   She needed to write agreements out. This is in her
13   handwriting. She needs to write the agreement out.
14        Q   For it to be properly processed under the grievance
15   procedure, correct?
16        A   That's one of the steps.
17        MS. BAY:  Okay, great. Thank you. No other
18   questions.
19        ARBITRATOR CLARK:  I have one small question.
20   Would you give Joint Exhibit Number 4 to Mr. Lee. Mr. Lee,
21   is there anything in your response to Ms. Faison, which
22   raises the issue of your not receiving a grievance in
23   appropriate form?
24        THE WITNESS:  I see nothing on this later.
25        ARBITRATOR CLARK:  In other words, you treated the
```

PAGE 135

```
 1   grievance, ●ording to this document, as subject to being
 2   denied, solely because the employee was a probationary
 3   employee? Is that not correct?
 4        THE WITNESS:  That is not correct.
 5        ARBITRATOR CLARK:  Explain what you intended to
 6   convey in this letter.
 7        THE WITNESS:  In the first sentence of the second
 8   paragraph, this issue was terminated for cause. There was
 9   progressive discipline, and I was also bringing to their
10   attention that she was a probationary employee. I stated the
11   statute in there, the last sentence, saying that "shall not
12   be subject to the grievance procedure."
13        Because at that point, I had a one line letter from
14   her, that made no statements concerning discrimination; just
15   that they didn't agree with it.
16        MS. BAY:  We know you had that in your possession.
17   You refer to it in your letter, I believe.
18        THE WITNESS:  I'm sorry, let me see. Yes, I'm
19   responding to this. Okay, my response back was basically
20   that she was fired for cause. It was basically a performance
21   issue and she was also in her probationary phase.
22        ARBITRATOR CLARK:  But there is no where in there
23   that you make a statement that the grievance has been sworn
24   in an untimely manner, or that you were not informed about
25   the basis for the claim.
```

PAGE 136

```
 1        THE WITNESS:  I didn't consider 20 days to be a
 2   grievance, because the time had already elapsed at that
 3   point.
 4        ARBITRATOR CLARK:  But you didn't put that in your
 5   letter.
 6        THE WITNESS:  I did not put that in my letter. I
 7   mean, there are other things that were not in compliance. I
 8   didn't see fit to add those in, also. But I was just
 9   underscoring to their attention the main underscoring reason why
10   we terminated her. Because they said it was for sexual
11   harassment, I'm telling her, no, it's for cause, and we show
12   the documentation to support the cause.
13        It was sufficiently documented in the
14   investigation, which I gave her copies of, which she said she
15   shared with the Union.
16        ARBITRATOR CLARK:  Okay, that's all the questions I
17   have; thank you.
18        [Witness excused.]
19        MS. BAY:  I would like to call one rebuttal
20   witness, but I need a five minute break.
21        ARBITRATOR CLARK:  All right, five minutes; off the
22   record.
23        [Recess.]
24        MS. BAY:  We'd like to recall Dan Hall.
25   WHEREUPON,
```

SHEET 35    PAGE 137

1             DANIEL D. HA●
2    having been previously sworn, was recalled for examination by
3    counsel for the Authority and testified as follows:
4             DIRECT EXAMINATION
5        BY MS. BAY:
6       Q   I want you to tell us how your recommendation would
7    have come out in this matter if, on January 21st, the TV had
8    been seen in Mr. Miller's booth and you wrote a statement
9    that it was there, but there were no subsequent allegations
10   of sexual harassment.
11       MR. MAXWELL:  Objection, calls for speculation.
12       ARBITRATOR CLARK:  Overruled.  You may answer.
13       THE WITNESS:  The outcome recommendation for
14   termination would have been the same.  However, the time
15   lapse wouldn't have been there, because we would not have had
16   to address the sexual harassment, and it would have occurred
17   instantaneously.
18       BY MS. BAY:
19      Q   What about if it had been a different official that
20   had caught Ms. Miller with the TV in her booth?
21       ARBITRATOR CLARK:  I'm not clear about the
22   question.
23       BY MS. BAY:
24      Q   Would your recommendation have changed if it had
25   been a different management official that had seen the TV in

PAGE 138

1    Ms. Miller's booth that night?
2       A   The outcome would have been the same, because she
3    had previously gotten another, indicating that if she
4    received another violation notice within 90 days, it would
5    have been termination.
6       Q   We've heard testimony today about Captain Highland
7    conducting an internal investigation into her sexual
8    harassment complaint.  How did that affect your investigation
9    into the disciplinary matter in regards to the TV?
10      A   I was asked once before why my investigation took
11   so long.  In actuality, I didn't get the investigation until
12   it was turned over from Internal Affairs to me.  Initially,
13   it was an Internal Affairs investigation, and then after it
14   got to a certain point, it was given to me.  I believe it was
15   in that May time frame, and that's when I did the
16   investigation.  I reviewed all the documents that were turned
17   over from Internal Affairs, and I completed the
18   investigation.
19       MS. BAY:  No further questions.
20       MR. MAXWELL:  No questions.
21       [Witness excused.]
22       MS. BAY:  We would call Mr. Lee.
23   WHEREUPON,
24            JERRY LEE
25   having been previously sworn, was recalled for examination by

PAGE 139

1    counsel for the Authority, and testified as follows:
2             DIRECT EXAMINATION
3        BY MS. BAY:
4       Q   We heard Ms. Miller's mother Deborah talk this
5    afternoon about the dereliction of duty writeup that she
6    received for her involvement in what happened on the evening
7    of January 21st.
8       A   Yes.
9       Q   Were you involved in that discipline?
10      A   I was.
11      Q   Can you explain what occurred?
12      A   I take exception to the original report that came
13   down from civil rights, where it said you were in violation
14   of certain things.
15      Q   You have to explain.
16      A   Well, in the civil right violation, it says that
17   she was in violation of the sexual harassment policy at
18   Metro.  I take exception to that.
19      Q   It said that about Deborah Miller?
20      A   Yes, I took exception, because I didn't think she
21   was in violation of that.  So I contacted civil rights and I
22   discussed it with them.  I concurred after a while that I
23   basically I was not going to go forward with this for that
24   reason.
25       But I did think that she had an action that was

PAGE 140

1    contrary to our departmental rules.  Because she was over
2    there attempting to retrieve a document that was involved in
3    an investigation for the transit police.  Because there was a
4    statement where she had violated the rules.  She had no right
5    to do it.  She was not obligated to do it.  She put herself
6    in that area to get that done.
7        On the occasion when I told her about that, I had a
8    written dereliction, and I had her supervisor to serve the
9    dereliction on her.  She refused to sign the dereliction.
10   She was informed that it was already written on her notice
11   that she received the dereliction.
12       In which case, what we normally do then, we would
13   order the officer to sign the dereliction.  If they refuse
14   the order, we would charge them with failure to obey a direct
15   order, which you can be terminated for.  A captain in revenue
16   called me and apprised me of this.
17      Q   Apprised you of what?
18      A   That she was refusing to sign the dereliction.  I
19   asked her to come down.  We did have a meeting on that
20   occasion.  We did have that meeting.  I told her, this is not
21   your admission of guilt.  It's just that you received a copy
22   of it, and you still have the right to grieve and everything
23   else associated with it.
24       She said that I didn't understand what the
25   investigation was.  She said she never asked for those

**Court Reporting Services, Inc.**

SHEET 36    PAGE 141

1  documents. I said, what I'll then is, I will not sign
2  this dereliction at this time for service, and I will
3  investigate.
4       I investigated it. When I investigated it, I found
5  in Dana Miller's statement, she said her mother asked for the
6  document. In Deborah Miller's statement, she says she asked
7  for the document. In the Q and As, she said she asked for
8  the document, and even Mr. Johnson said she had asked for the
9  document.
10      At which time, I had another dereliction drawn up.
11 I called her back down. I gave her the dereliction again,
12 and I explained to her what I did and what I did to go look
13 into her allegations in saying that it was false. At which
14 time, I told her she needed to sign the dereliction, and if
15 she wanted to grieve it, she still had that complete right to
16 do so.
17      She signed the dereliction. So what we did, we
18 took that dereliction and the first one that she refused to
19 sign, that my captain wrote on and sent to me, and placed
20 them both in her service file. Then there was a dereliction,
21 and the dereliction is the lowest level of discipline
22 associated with the transit police, other than a verbal
23 warning. It's the lowest written type of discipline
24 available.
25      Q    When management found out, either sometime late on

PAGE 142

1  January 21st or some time early on January 22nd, about the
2  allegations that Mr. Johnson had sexually harassed Ms.
3  Miller, what actions were taken in regards to Mr. Johnson?
4       A    Mr. Johnson was relieved of his duty. He was taken
5  out of his work place. He was put in the Metro parking lot
6  as an observer. Basically, if he were to see anything, he
7  was to call us. Basically, he had no special police powers.
8  He had no interaction at all with any other employees. He
9  worked as a separate sworn police officer, and he was no
10 where near any of the facilities in which the special police
11 have any control over.
12      Q    Did he stay in that capacity until he was
13 terminated?
14      A    He stayed in that capacity until the day I met him.
15 That was the day that I terminated him.
16      MS. BAY: No further questions.
17                CROSS EXAMINATION
18      BY MR. MAXWELL:
19      Q    You testified that you could have ordered Mrs.
20 Miller to sign the dereliction of duty, correct?
21      A    I did.
22      Q    And that if she violated that order, she could be
23 terminated?
24      A    That is true.
25      Q    So then there are things that an officer can do

PAGE 143

1  that warrant termination, without there being any further
2  investigation or whatever.
3       A    Absolutely, there are things that would warrant an
4  officer to be terminated right away. That includes crimes.
5  That includes gross dereliction of duty. That would be
6  dereliction of duty, not to follow an order in a para-
7  military organization.
8       Q    Thank you.
9       A    You do not have the option of being able to say no
10 or not to follow an order of a superior. That is the reason
11 for the command structure.
12      MR. MAXWELL: Thank you, I have no further
13 questions.
14      MS. BAY:  Thank you.
15      [Witness excused.]
16      MS. BAY:  We rest.  Would you like written briefs?
17      ARBITRATOR CLARK: Yes.
18      MS. BAY:  Do you want to talk about date, or do you
19 want to wait until we get the transcripts?
20      MR. MAXWELL: Okay, do you want to wait until then?
21      MS. BAY:  Yes, and then we'll let you know.
22      ARBITRATOR CLARK: That's fine, whichever way works
23 best.
24      [Whereupon, the proceeding in the above-entitled
25 matter was adjourned.]

# M E M O R A N D U M

## CONFIDENTIAL

SUBJECT: Results of Investigation            DATE:  April 30, 2004
Complaint No. 373-04 Filed by
Dana Miller

FROM: CIVR - Cynthia L. Myers

TO: MTPD - Polly L. Hanson

This is to inform you that the Office of Civil Rights (CIVR) has recently completed its investigation of the complaint of discrimination filed by Dana Miller (hereinafter "Complainant"), Special Police Officer, MTPD.  The complainant is charging the Authority with discriminatory employment practices.

Specifically, she alleges that she was sexually harassed by Lieutenant Franklin Johnson when he requested a sexual favor in exchange for not turning in paper work regarding a violation of policy by the Complainant.    Specifically, Lt. Johnson asked the Complainant to meet him at a gas station near his house and then asked her to follow him to his home in Fort Washington, MD.  She further alleges that Lt. Johnson touched her breast as he attempted to take her coat upon entering his home.

Our investigation found that there was sufficient evidence to find a probable cause of discrimination in this complaint.  The evidence shows that Lt. Johnson is not a credible witness as three different witnesses contradict his testimony, including the Complainant.

Central to this case is Lt. Johnson's failure to submit the Complainant's incident report to Lt. Tisdale when he returned from Shady Grove, nor did he mention the violation to her, despite the fact that both he and Lt. Tisdale spoke for at least two hours upon his return to the Bladensburg Yard.  Additionally, Lt. Johnson claimed he failed to disclose to Lt. Tisdale his contention that the Complainant made a sexual advance toward him in exchange for the paperwork because he forgot to do so.  However, considering that the knew that the Complainant had received a letter from Deputy Chief Hall warning of her possible termination if she violated another policy, it is hard to believe that an action as significant as a sexual advance in exchange for job protection can be ignored or overlooked by Lt. Johnson.  Lt. Johnson's failure to turn in the Complainant's incident report and report the Complainant's alleged sexual proposition to his supervisor significantly weakens his credibility.

Washington
Metropolitan Area
Transit Authority

Exhibit No. 14

Chief Polly Hanson Memorandum
Page 2

Further, Lt. Johnson stated during his interview with the EEO Investigator that he left the Complainant's incident report regarding the violation of WMATA's policy at work. However, Lt. Tisdale states that Lt. Johnson told her that he had the statement with him in his personal vehicle, which he drove home earlier that morning.

While there is no direct evidence to show that Lt. Johnson gave his personal cellular telephone number and home address to the Complainant, there is also no evidence to show that the Complainant nor her mother received this information from any WMATA records or officials. Lt. Johnson failed to establish that the Complainant received his telephone number and house address through any other means than himself. Additionally, Lt. Johnson could not explain how the Complainant knew that his wife was in "Carolina" that night.

The evidence also shows that Lt. Johnson also failed to promptly submit an incident report in another situation involving a different employee who had been warned in writing by Deputy Chief Hall of her potential termination if she violated another WMATA policy, and who was subsequently found with a television in her work area. In this case, Lt. Johnson did not turn in the report until several days after the incident. The employee involved maintains that Lt. Johnson lied to her when he allegedly threw the report in the trash and told her that he was not going to say anything about the matter. Lt. Johnson's conduct in this incident further diminishes his credibility in this complaint.

Although the Complainant's claim regarding Lt. Johnson's request for a sexual favor cannot be corroborated, his lack of overall credibility gives credence to her allegation. Particular attention much be given to the inconsistencies and number of holes in his responses to Lt. Tisdale. His purported lack of knowledge about key factors is troubling.

However, there is no evidence to support the Complainant's allegation that Lt. Johnson grabbed her breast. The Complainant did not raise this specific allegation during the initial one-hour telephone interview with the EEO Investigator on January 22, 2004. The Complainant contacted the EEO Office on the next day to indicate that she forgot to raise this allegation during the telephone interview and wanted it to be added to her complaint.

The evidence further shows that the Complainant has admitted to violating WMATA's policy. Through her own admission, the Complainant did have a television in the kiosk and knew that it was a violation to have it on post.

Chief Polly Hanson Memorandum
Page 3

Additionally, she admitted that she stated to Lt. Johnson that she could not afford another incident because it could result in her termination and asked whether he could give her a warning instead of a write-up. The evidence shows that it was the Complainant's goal to obtain the incident report from Lt. Johnson and not turn it in to the appropriate MTPD supervisors for the purpose of saving her job. Both she and her mother, Officer Deborah Miller, went to Lt. Johnson's house and requested the paperwork from Lt. Johnson. The evidence suggests that had Lt. Johnson given the Complainant and her mother the incident report, it was unlikely that they would have submitted it to the appropriate management officials, nor was it likely that she would have reported the sexual harassment allegation to CIVR.

The evidence further shows that the Complainant purposely provided false information to Lt. Tisdale. The Complainant admitted that she lied to Lt. Tisdale over the telephone on the same day of the incident. The Complainant states that Lt. Tisdale called her and asked whether Lt. Johnson was there, to which she answered, "No," even though Lt. Johnson was standing in front of her. She states that Lt. Johnson was motioning to her not to let Lt. Tisdale know that he was there. There is no evidence that this incident occurred. Lt. Tisdale denies asking the Complainant whether Lt. Johnson was there and Lt. Johnson denies asking the Complainant to lie to Lt. Tisdale. Additionally, there was no legitimate reason for Lt. Johnson to ask the Complainant to lie to Lt. Tisdale since Lt. Tisdale directed Lt. Johnson to go to Shady Grove anyway. However, whether this incident occurred or not, the Complainant's admission that she intended to lie to Lt. Tisdale is clear.

The evidence further shows that the Complainant's mother, Officer Deborah Miller, violated WMATA's Sexual Harassment Policy by accompanying her daughter to Lt. Johnson's home. Her actions appear to be both inappropriate and threatening. It is the responsibility of all WMATA employees to report allegations of sexual harassment immediately to their supervisor or to CIVR. Instead, Officer Miller took action into her own hands by confronting Lt. Johnson at his residence. The evidence suggests that Officer Deborah Miller wore her badge around her neck when she knocked on Lt. Johnson's door, which could have been perceived as a form of intimidation.

Chief Polly Hanson Memorandum
Page 4

Therefore, it is CIVR's decision to find a probable cause of discrimination in this complaint. Based upon our findings, the following actions are recommended:

1.    Appropriate disciplinary action should be taken against Lt. Johnson for violating WMATA's Sexual Harassment Policy, up to and including demotion. The discipline should be severe enough to demonstrate WMATA's commitment to providing employees a work environment free of sexual harassment or intimidation. Please provide CIVR documentation evidencing the disciplinary action.

2.    Appropriate disciplinary action should be taken against Officer Deborah Miller (Complainant's mother) for violating WMATA's Sexual Harassment Policy, up to and including a letter of warning. The discipline should be severe enough to demonstrate WMATA's commitment to providing employees a work environment free of sexual harassment or intimidation. Please provide CIVR documentation evidencing the disciplinary action.

3.    While there are no specific Civil Rights violations by the Complainant, the evidence does show that she violated other WMATA policies and/or procedures. Therefore, CIVR is forwarding this information to you for appropriate response and action.

cc:    MTPD - George L. Heilmann

# M E M O R A N D U M



**SUBJECT:** Letter of Termination                    **DATE:**   June 3, 2004

  **FROM:** MTPD - Chief Polly L. Hanson

    **TO:** MTPD - Special Police Lieutenant
        Franklyn Johnson

Two investigations were initiated in reference to an allegation of sexual harassment made against you, one by the Metro Transit Police and the other by WMATA's Civil Rights Department.  The investigations, which were both thorough and comprehensive, included interviews and written statements.  Your conduct was determined to be unprofessional and in violation of WMATA Policies & Procedures.  Accordingly, I have approved a recommendation that you be terminated from the employ of the Washington Metropolitan Area Transit Authority effective immediately.

**Washington
Metropolitan Area
Transit Authority**

I HAVE READ THIS REPORT
AND I AM AWARE THAT A
COPY WILL BE PLACED IN
MY PERSONNEL FOLDER.

SIGNATURE / DATE

*Exhibit No. 15*