# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DANA MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2342 (RMC) |
| | ) | |
| WASHINGTON METROPOLITAN | ) | |
| AREA TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Before the Court are cross motions for summary judgment. Plaintiff Dana Miller contends that she was fired from her job as a Special Police Officer ("SPO") with Defendant Washington Metropolitan Area Transit Authority ("WMATA") in retaliation for reporting sexual harassment by a male superior. According to WMATA, however, Ms. Miller was terminated for multiple violations of WMATA's rules and regulations that were unrelated to the alleged sexual harassment incident. After reviewing the record, the Court finds that Ms. Miller has no evidence of a causal relationship between the alleged sexual harassment and WMATA's decision to terminate her employment. Accordingly, WMATA's motion will be granted, Ms. Miller's motion will be denied, and judgment will be entered in favor of WMATA.

## I. BACKGROUND FACTS

The material facts are essentially undisputed. On July 21, 2003, WMATA hired Ms. Miller as an SPO. Def.'s Stmt. of Material Facts Not In Dispute ("Def.'s Facts") ¶ 1. An SPO's primary duty is to serve as a security guard at WMATA facilities within WMATA's transit zone.

*Id.* As a condition of her employment under the applicable Collective Bargaining Agreement, Ms. Miller was required to serve a one-year probationary period. *Id.*

WMATA began experiencing problems with Ms. Miller's performance almost immediately. On December 29, 2003, less than six months into Ms. Miller's probationary period, Ms. Miller's supervisor, Deputy Chief Daniel Hall, drafted two memoranda documenting her multiple violations of WMATA's rules and regulations. The first memo detailed Ms. Miller's fourth incident of tardiness within three months and recommended a one-day suspension without pay. Def.'s Ex. 4. The second memo detailed a two-hour absence from Ms. Miller's guard post for which she had no permission or excuse. Def.'s Ex. 5. For that infraction, Deputy Chief Hall recommended a two-day suspension without pay. *Id.* Ms. Miller eventually served two one-day suspensions without pay for the violations detailed in the December 29 memos. Def.'s Facts ¶¶ 7-8.

On January 16, 2004, Deputy Chief Hall gave Ms. Miller her Mid-Year Performance Evaluation. *Id.* ¶ 9. In addition to the infractions detailed in the December 29 memos, the Mid-Year Performance Evaluation documented one incident in which Ms. Miller abandoned her post without authorization and another incident in which Ms. Miller failed to report for work due to inclement weather. Def.'s Ex. 6. Ms. Miller admitted that she was guilty of all the infractions detailed in the Mid-Year Performance Evaluation. *See id.*; *see also* Def.'s Ex. 16 (Pl.'s Resp. to Def.'s Requests for Admission) ¶¶ 15-19, 21-23. The report on the investigation into these incidents of misconduct stated that Ms. Miller was "unreliable" and concluded that it was in WMATA's best interest to "terminate [her] employment." Def.'s Ex. 6. Nonetheless, Deputy Chief Hall elected to give Ms. Miller one more chance and, instead of firing her, informed her that if her performance did not improve within the next 90 days she would be terminated. *Id.* The Evaluation stated that Ms. Miller

2

was expected to report on time, be attentive to her duties, "and comply with WMATA's policies and procedures." *Id.* Deputy Chief Hall made it clear to Ms. Miller that "any type of disciplinary action within the next 90 days . . . would mean her termination." Def.'s Ex. 13 (Transcript of Pl.'s Grievance Hearing, Testimony of Daniel Hall) at 26:16-18.

On January 21, 2004, less than a week after Ms. Miller's Mid-Year Performance Evaluation, Special Police Lt. Franklin Johnson was sent to Ms. Miller's guard post to deliver two mousetraps. Def.'s Ex. 7. When Lt. Johnson arrived, he found the post unmanned and observed a combination radio/television on the counter. It is a direct violation of SPO General Post Instruction No. 10 to have a television of any kind, including a radio/television combo, in a guard post kiosk. *See* Def.'s Exs. 2 & 3. When Ms. Miller returned, Lt. Johnson (who was Ms. Miller's superior but not her supervisor) reminded her that it was a violation of WMATA rules to have a television at her guard post and instructed her to draft a statement admitting the infraction. Def.'s Ex. 7. Ms. Miller complied and wrote a statement in which she admitted to having a television in violation of WMATA rules. Def.'s Ex. 8. Ms. Miller also informed Lt. Johnson that she was on notice that any infraction would result in the termination of her employment and asked him to let her off with a warning instead of reporting the incident. Def.'s Ex. 7.

At this point, the facts take an unexpected and unfortunate turn. After Ms. Miller informed him of her tenuous employment situation, Lt. Johnson offered not to report the incident if she would agree to have sex with him later that evening. *See* Def.'s Ex. 9. Ms. Miller agreed but, unknown to Lt. Johnson, she had no intention of following through on his proposal; instead, she planned to bring her mother with her to the tryst in order to take photographs and witness Lt. Johnson's advances. *Id.* Ms. Miller claims that her mother called Deputy Chief Hall immediately

3

after Ms. Miller informed her of the incident (Ms. Miller's mother is herself an SPO), but he did not answer the phone and she did not leave a message.  Affidavit of Dana Miller ¶ 8.

When Ms. Miller arrived at Lt. Johnson's home that night (with her mother hiding in the backseat of her car), Lt. Johnson invited her inside, took off her coat, and began fondling her breast.  *Id.*; Def.'s Ex. 9.  Shortly afterwards, Ms. Miller's mother knocked on the door and Lt. Johnson let her in.  Def.'s Ex. 9.  Ms. Miller's mother stated that Lt. Johnson's conduct violated WMATA's sexual harassment policies and asked him to turn over the statement in which Ms. Miller admitted to having a television in her guard booth.  *Id.*  Lt. Johnson refused, and Ms. Miller and her mother left.  After they departed Lt. Johnson's residence, Ms. Miller's mother called Deputy Chief Hall to report the incident.  *Id.*

One week later, on January 28, 2004, Ms. Miller filed a sexual harassment charge against Lt. Johnson with WMATA's Office of Civil Rights.  Def.'s Ex. 12.  The Office of Civil Rights asked Deputy Chief Hall not to take any disciplinary action against Ms. Miller in connection with her possession of the television in her working booth pending the outcome of their investigation into her sexual harassment charge.  *See* Def.'s Ex. 12 (Transcript of Pl.'s Grievance Hearing, Testimony of Daniel Hall at 35:4-12).  The investigation concluded that there was probable cause to conclude that Lt. Johnson sexually harassed Ms. Miller, and Lt. Johnson was dismissed as a result. Def.'s Exs. 14 & 15.  The investigation also noted that WMATA's sexual harassment policy requires that harassment be reported immediately after the incident occurs and that Ms. Miller (and her mother) violated that policy by failing to file a report until after the encounter at Lt. Johnson's house. Def.'s Ex. 14.

4

After completing the investigation into Lt. Johnson's transgressions, WMATA turned its attention back to Ms. Miller's recurrent misconduct  In a memorandum dated May 4, 2004, Deputy Chief Hall informed Metro Transit Police Chief Polly Hanson of Ms. Miller's most recent breach of WMATA policy — namely, her possession of a television in a guard booth in violation of General Post Instruction 10.  Def.'s Ex. 7.  Deputy Chief Hall recommended that Ms. Miller's employment be terminated for cause "based upon continued unsatisfactory performance."  *Id.*  On June 1, 2004, Chief Hanson sent a termination letter to Ms. Miller explaining that she was being dismissed for violating General Post Instruction 10 after she was expressly warned during her Mid-Year Evaluation that any additional disciplinary action within a 90-day period would result in her termination.  Def.'s Ex. 10.

Ms. Miller filed a complaint with the Equal Employment Opportunity Commission ("EEOC") Office on June 23, 2004.  Miller Aff. ¶ 17.  The EEOC issued a right-to-sue letter on September 8, 2005.  *Id.* ¶ 18.  Ms. Miller filed the Complaint in this action on December 7, 2005, in which she asserts four causes of action: three claims for employment discrimination against WMATA under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; and one claim for battery against Lt. Johnson, presumably under the common law of Maryland, which is where the alleged fondling took place.[1]  After engaging in discovery, both parties filed dispositive motions on November 17, 2006, and opposition briefs on November 28, 2006.  Neither party chose to file a reply brief.  Accordingly, both motions are now ripe for decision.

---

[1]  Ms. Miller voluntarily dismissed Lt. Johnson as a defendant on September 12, 2006, and therefore the battery claim is no longer before the Court.  The Court has federal-question jurisdiction over Ms. Miller's Title VII claims under 28 U.S.C. § 1331 because they arise under federal law.

## II.  LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248.  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  The nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993).  Rather, the nonmoving

party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III. ANALYSIS

Ms. Miller alleges that she was the victim of sexual harassment in violation of Title VII based on two theories: *quid pro quo* harassment and hostile work environment harassment. *See* Compl. ¶¶ 25-26. She also claims that WMATA violated Title VII by firing her in retaliation for reporting the alleged harassment. *See id.* ¶ 27. In order to prove harassment on a theory of *quid pro quo*, Ms. Miller must demonstrate that "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998). If there was no "tangible employment action" to establish *quid pro quo* harassment, Ms. Miller may still prove a Title VII violation by demonstrating that she was subjected to "bothersome attentions or sexual remarks," *id.* at 751, that were "so severe or pervasive as to alter the conditions of [her] employment and create an abusive working environment," *Clark County School District v. Breeden*, 532 U.S. 268, 270 (2001) (internal quotation marks omitted). To establish a claim for retaliation in violation of Title VII, Ms. Miller "must show that (1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection between the two exists." *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999).

With respect to her *quid pro quo* theory, Ms. Miller argues that if she had submitted to Lt. Johnson's sexual demands, he would have destroyed her confession and she never would have been fired. Pl.'s Mem. of P. & A. In Support of Mot. for Summ. J. ("Pl.'s Mem.") at 10-11. Thus, she argues that she suffered an adverse employment action as a result of her refusal to have sex with

a superior. Not only is this argument based on an incomplete, self-serving version of the factual record, it actually proves that there is no causal link between Lt. Johnson's behavior and Ms. Miller's termination because it tacitly concedes that Ms. Miller would have been fired in the absence of Lt. Johnson's alleged harassment. In other words, if Lt. Johnson had acted appropriately, and had reported Ms. Miller's violation of General Post Instruction 10 without offering to refrain from reporting the infraction in exchange for sex, Ms. Miller would have been dismissed for violating WMATA's rules within 90 days of her Mid-Year Evaluation. Thus, there is no causal connection between Ms. Miller's rejection of Lt. Johnson's sexual advances and WMATA's decision to fire her.

This is not a case where a supervisor threatens to fire a subordinate unless she has sex with him, as Ms. Miller suggests. Here, Lt. Johnson had nothing to do with the decision to terminate Ms. Miller — that decision was made by Deputy Chief Hall and Chief Hanson. That fact is that Ms. Miller violated the rules and was fired for it; Lt. Johnson tried to take advantage of that situation in an inappropriate way, but he did not place Ms. Miller in that situation. To find that Lt. Johnson's conduct amounted to *quid pro quo* sexual harassment would put Ms. Miller in a better position than she would have been in if the harassment had not occurred, which is clearly not what Title VII contemplates. *Cf. Dougherty v. Barry*, 869 F.2d 605, 615 n.9 (D.C. Cir. 1989) (noting that remedies awarded under Title VII should not leave a plaintiff better off than she would have been absent the discrimination).

Even assuming that the evidence could establish a causal link between Ms. Miller's refusal to have sex with Lt. Johnson and WMATA's decision to fire her, Ms. Miller cannot prevail. Upon a prima facie showing of *quid pro quo* sexual harassment, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action. *See McDonnell*

8

*Douglas Corp. v. Green*, 411 U.S. 792, 803-04 (1973). If the employer is able to do so, the burden shifts back to the plaintiff to prove that the stated reason is a pretext. *See id.* at 804-05. Here, there is ample evidence in the record indicating that Ms. Miller was terminated for having a television in her guard booth in violation of WMATA policy after a long, well-documented series of infractions. Ms. Miller points to nothing in record to suggest that this was a pretext.

With respect to Ms. Miller's hostile work environment theory, Ms. Miller argues that WMATA's Office of Civil Rights concluded that Lt. Johnson harassed her and, therefore, she has evidence sufficient to support a finding of harassment. Pl.'s Mem. at 12. A finding by WMATA that one of its employees probably violated its internal sexual harassment policy is not sufficient proof that the employee and/or WMATA violated Title VII. To prevail on a theory of hostile work environment harassment, Title VII requires a showing that the harassment was so "severe or pervasive" that it altered the conditions of employment. *Breeden*, 532 U.S. at 270. In other words, "a workplace environment becomes 'hostile' for the purposes of Title VII only when offensive conduct 'permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Barbour v. Browner*, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)). "Harassment 'must be more than episodic'; to be pervasive, it must be 'sufficiently continuous.'" *Williams v. Verizon Wash., DC, Inc.*, 266 F. Supp. 2d 107, 124 (D.D.C. 2003) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 776 n.1 (1998)). Thus, generally speaking, hostile work environment claims are based on "the cumulative effect of individual acts" rather than on discrete incidents of harassment. *See Nat'l R. R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

Lt. Johnson's conduct, although deplorable, was an isolated, one-time occurrence; it did not permeate Ms. Miller's workplace with continuous insult or torment. Although it is possible that a one-time incident could be so severe that it changes the conditions of employment by creating an abusive working environment, on the facts presented here Ms. Williams cannot — as a matter of law — prove that Lt. Johnson's conduct altered the conditions of her working environment in violation of Title VII. *See, e.g.*, *Tatum v. Hyatt Corp.*, 918 F. Supp. 5, 7 (D.D.C. 1994) ("[A]bsent the most stringent circumstances, courts have refused to hold that one incident in itself was so severe as to create a hostile work environment.").

Finally, Ms. Miller's retaliation claim fails for the same reasons as her harassment claims. Ms. Miller has shown that she engaged in a protected activity, *i.e.*, rejecting Lt. Johnson's advances and filing a formal EEOC complaint; and that she suffered an adverse personnel action, *i.e.*, her termination. As discussed above, however, she has not shown any causal connection between the two. Lt. Johnson did not fire Ms. Miller; rather, Deputy Chief Hall and Chief Hanson made the decision to terminate her employment for reasons unrelated to the sexual harassment incident with Lt. Johnson. Even assuming that the record contained some evidence of a causal link, Ms. Miller has failed to rebut the non-retaliatory reason for her suspension — namely, her admitted violations of WMATA's work rules. Because Ms. Miller has no evidence to establish a necessary element of her retaliation claim — *i.e.*, a causal link between her protected activity and the adverse employment action — WMATA is entitled to judgment as a matter of law.

## IV.  CONCLUSION

There can be no dispute on the facts before the Court that Ms. Miller was fired from her job as an SPO for multiple violations of WMATA's rules and regulations. Although her last

violation was marred by an incident in which a superior offered to overlook the violation in exchange

for sex, the fact remains that there is no causal connection between WMATA's decision to terminate

her employment and the alleged incident of sexual harassment.  And although the incident was

deplorable, its not so severe or pervasive that it subjected Ms. Miller to an abusive working

environment.  Accordingly, she cannot prove her Title VII claims and WMATA is entitled to

judgment as a matter of law.  A memorializing order accompanies this Memorandum Opinion.


Date: June 11, 2006                                        _____/s/_____
                                                          ROSEMARY M. COLLYER
                                                          United States District Judge


11